**Titu-Serban IONESCU, Plaintiff,**

**v.**

**E. F. HUTTON & COMPANY (FRANCE) S. A., Bernard J. Mallet and Axel Thiel, Defendants.**

**No. 76 Civ. 5591(MP).**

United States District Court, S. D. New York.

Feb. 14, 1979.

See also D.C., 434 F.Supp. 80.

**140**

intended to and will vex and harass the defendant; that the suit constitutes an imposition on the Court's jurisdiction; and that its continuance in this Court will work material injustice. Accordingly, the defendant's motion will be granted and the complaint dismissed.

Richard B. Cooper, New York City, for plaintiff.

Cahill, Gordon & Reindel, New York City, by Thomas F. Curnin, Thomas J. Kavaler, New York City, for defendant Hutton (France).

## OPINION AND DECISION

POLLACK, District Judge.

This is an action for a share of a brokerage commission alleged to be due the plaintiff for participating with others in arranging a loan of money from Saudi Arabian interests to either the Government of France or French national corporations. The plaintiff is a citizen and resident of New York. The defendant E. F. Hutton & Company (France) S.A. ("Hutton (France)") was, at the time the complaint was filed, a French corporation having its principal place of business in Paris and engaged there in investment banking. It has since been dissolved. The defendant Bernard J. Mallet, a citizen and resident of France, was President of Hutton (France) during the time of the events complained of. The defendant Axel Thiel is alleged in the complaint to be a citizen of West Germany. Neither Mallet nor Thiel has been served with process in the two years since this complaint was filed, and their presence in the complaint may be disregarded. Hutton (France), therefore, will sometimes be referred to for convenience as "the defendant," since there is no other before the Court.

Hutton (France) has moved to dismiss the complaint for forum non conveniens. For the reasons shown in detail below, the Court finds and concludes that a trial in this forum will unjustly be oppressive; that the filing of this suit in this Court was

I.

### Procedural History

The complaint was filed in December 1976. Hutton (France) moved to dismiss the complaint for lack of jurisdiction over the subject matter, failure to join indispensable parties, improper venue, lack of personal jurisdiction, and *forum non conveniens,* or to quash the purported service of process.

After oral argument on March 4, 1977, the Court on March 10, 1977, denied those branches of the motion asserting lack of jurisdiction over the subject matter and improper venue; denied without prejudice to renewal those branches of the motion asserting failure to join indispensable parties and *forum non conveniens;* and stayed all other proceedings pending discovery and an evidentiary hearing on the question of the Court's personal jurisdiction of Hutton (France).

After substantial discovery by the plaintiff and further briefing, the parties again appeared before the Court on June 17, 1977, at which time the defendant renewed its motion to dismiss for *forum non conveniens.* On June 21, 1977, the Court filed a memorandum expressing grave misgivings about the propriety and fairness of exercising jurisdiction over this controversy and over Hutton (France). The Court expressed a desire for briefs on the law applicable to Ionescu's claim and, if foreign law was to be applied, on whether the plaintiff's theory of liability was actionable in France. The Court requested as well a showing that a reasonable basis existed for the claim asserted herein. Pending receipt of these briefs, the Court held in abeyance its decision on the motion to dismiss.

On July 25, 1977, the Court denied the motion to dismiss for lack of personal jurisdiction, 434 F.Supp. 80 (S.D.N.Y.1977). The Court's memorandum pointed out that the defendant was a French corporation, not qualified to do business in New York, but was a wholly-owned subsidiary of a Swiss corporation, which in turn was a wholly-owned subsidiary of a Delaware corporation, E. F. Hutton & Company, Inc., which was doing business in New York. Finding that Hutton (France) could be considered an incorporated branch or department of Hutton & Company, the Court sustained service of process on the defendant through its New York affiliate and denied the motion to dismiss for lack of personal jurisdiction over Hutton (France).

The Court's memorandum confirmed that the motion to dismiss on the grounds of *forum non conveniens* had been renewed by permission and was being held in abeyance pending further discovery to illumine questions of foreign law and jurisdiction as well as the question of whether a reasonable basis existed for this suit. Discovery was then undertaken by the parties, including depositions of the plaintiff and Malka, one of his Canadian associates (both of whom had submitted affidavits of merit) as well as of Mrs. de Rosset and Messrs. Grae and Corley (persons whose hearsay information had been recounted in the affidavits of Ionescu and Malka), and of Bernard Mallet in Paris.

On the basis of the extensive matter thereby assembled, the parties supplied further briefs setting forth their arguments on the issue of *forum non conveniens.* It appeared without contradiction that the law of France probably would govern the claim and that the theory of liability relied on by the plaintiff was actionable in the French courts. The Court then took the matter under advisement.

## II.

### *Plaintiff's Version*

The plaintiff alleges that in 1974 either the Government of France or certain French national corporations ("the borrowers") were seeking loans of up to $4 billion. Hutton (France) agreed with the borrowers to act as their agent in obtaining the loans. Mallet, President of Hutton (France), turned in Paris for assistance in finding lenders to one Pinay, a Frenchman, who introduced Mallet to another Frenchman, one Lassagne. Mallet met with Lassagne in Paris, and the two agreed orally that Lassagne would help to raise the funds.

Lassagne telephoned from Paris to one Charles Malka in Montreal, enlisted his assistance in the search for the loan, and promised him a 2.5% commission. Lassagne confirmed this arrangement by telex to Malka, sent from Paris with the consent of Hutton (France). Malka brought in his Montreal associates, Bernard Blanchard and Virgil Pacuraru. The latter telephoned Ionescu in New York, where he was employed as a legal assistant by the law firm of Riposanu, Liebowitt & Grae, and solicited Ionescu's assistance in the search for funds.

Ionescu then took the matter up with Joel Grae, one of his employers, and Axel Thiel, a West German then living in New York. Grae told Ionescu and Thiel that he knew one Hassan Enany, a well-placed Saudi Arabian who might be able to procure the loans. Ionescu, Grae and Thiel agreed that they would seek Enany's help.

Ionescu then advised Malka and Blanchard in Montreal of the possibility that a loan could be arranged through Enany. Malka relayed the news of this possibility to Lassagne in Paris, who in turn informed Hutton (France).

Lassagne then spoke again by telephone with Malka and Blanchard in Montreal. The three agreed that a loan of $4 billion for 20 years at 6.4% interest should be sought from Enany. The commission to Malka and his Montreal colleagues was to be 2.5%. Ionescu alleges that the Montreal group promised him 20% of their commission, or one-half of one percent of the loan.[1]

---

1. Ionescu testified, however, that the French loan deal was a "joint venture" between Lassagne, Malka, Blanchard, Pacuraru, Ionescu, Grae, Thiel, a Mrs. de Rosset, an associate of

These terms on which Lassagne, Malka and Blanchard agreed were to be confirmed by a telex from Hutton (France) to the Bank of the Rhone in Geneva, after which confirmation the borrowers and lenders would be put in touch with each other. Mallet then sent the following telex to the Bank of the Rhone:

attention: mm. pollack, director—blanchard and malka code e f hutton paris

paris montreal Lassagne / 7

operation 100 800 1500

1—conditions of the proposed loan, accepted by the borrowers

—amount 2.500.000.000 us dollars (two billion five hundred million us dollars)

—term 20 years (twenty years)

—interest 6.40% compound fixed (six comma [point] forty percent)

—net proceeds 100% (one hundred percent)

2—agreement of the borrowers on charges

—engineering financing 2% (two percent)

—commission code malka 2.50% (two comma [point] fifty percent)

—commission code Lassagne 2.50% (two comma [point] fifty percent)

: 3,5)

cent)

—commission

cent)

3—procedure for disposition

100 millions us dollars shall be released immediately and put at the disposal of lloyds zurich—telex 56635—attention of mr muller, director—under the code reference above.

the disposition of the balance of the loan shall be made according to a method of operation determined by the parties conforming with negotiations which have to start immediately.

copy of the instant telex was sent to lloyds zurich which is waiting for con-

firmation from you of the commitment for the first block of 100 million dollars (hundred million)

bernard mallet, president general director of e f hutton (france) s a

vru

please ignore the three lines ":3,5) cent)—commission" transmitted by mistake

*correctly* received * * *

Ionescu claims that by this telex Hutton (France) became liable to the Malka group for a commission of 2.5% and to Ionescu for his 20% of that commission. The Bank of the Rhone confirmed to the Canadians that it had received Mallet's telex.

Ionescu and Grae, in New York, then telephoned. Enany in New Delhi. Enany said that he could arrange loans of $3 billion or more if the loans would be sufficiently guaranteed.

Ionescu and Grae then telephoned Blanchard in Montreal. Blanchard and Grae agreed that Blanchard would send Thiel a telex requesting loans of $3.9 billion, which telex Thiel would present to Enany in Beirut.

Thiel then left New York for Beirut via Bremen. At Ionescu's suggestion, Grae called Thiel in Bremen and told him to meet in Paris with Mallet, who would give him a written confirmation of the loan request to take to Enany.

Grae, Thiel, Enany and Mallet then conspired by telephone to by-pass the plaintiff and his Canadian colleagues in arranging the loans and thereby to deprive the Canadians of their commission and Ionescu of his 20% of that commission. Mallet and Thiel called Enany to confirm these plans to defraud the plaintiff and his associates.

Mallet then gave Thiel two letters, both on the letterhead of Hutton (France). One was addressed to the Minister of Finance of

Grae, and Enany. All commissions received by these joint venturers were to be pooled and 50% distributed to Enany, 25% to the Canadians, and 25% to the New Yorkers. It is un-

clear between whom this supposed agreement on commissions was made or whether it was to supersede Ionescu's agreement with the Canadians to receive 20% of their commission.

Saudi Arabia, the other to Enany. The letter to the Minister stated:

PARIS, June 24th. 1974.

To his Excellency the Minister of Finance of the Kingdom of SAUDI ARABIA

Your Excellency,

I, Berrard MALLET, Chairman of E.F. HUTTON (France) S.A. which is part of the E. F. HUTTON Group, one of the leading American Investment Banks, has been requested to secure and prenegotiate for prime French National Companies of the highest standing, a first loan of U.S. $ 100.000.000 at the following conditions:

- amount : US $ 100,000,000 – –
- period : 20 years
- Interest : 6.40% (compounded annualy and fixe)
- emission : 100%
- guarantee : one or two prime national or international banks
- payback : capital and compounded interest repaid at the end of the 20 year period, in one payment.

I wish to confirm that the negotiation of this deal it to be carried out in an utmost secrecy and I will also state that there is a firm and direct offer from the Borrower' side. I would like to add that we have been seeking for this capital several weeks and have not been able to contact the proper lending source.

I will be at your disposal and will, if necessary, come directly to a place designated by you or your people, to have prenegociation in behalf of this matter.

Yours sincerely,
Bernard J. MALLET
Chairman.

The letter to Enany stated:

PARIS, June 24. 1974.

His Excellency HASSAN ENANI

Your Excellency,

Following our conversations on the phone and the meeting held in Paris on Sunday June 23. with Mr. Axel THIEL,

we are sending enclosed the official confirmation that we are seeking for French National Companies of the highest standing, long term funds on a 20 year period and at a compound rate, the pay back being paied at the end of the period. It is understood that the loan will be guaranteed by first class National and/or International Banks.

Please find enclosed for your guidance the 1973 annual report of our group and an example of the "YEAR COUNTDOWN AND COUNTOUT".

I remain, Your Excellency,
Yours sincerely,
Bernard J. MALLET
Chairman.

Thiel delivered these letters to Enany in Beirut. Enany then flew to Saudi Arabia, where he presumably arranged the loan. The loan, of $4 billion, closed during the second week of July 1974. Commissions of $289 million were allegedly paid, of which the plaintiff received nothing.

Ionescu now sues Hutton (France) for $20,000,000, or 20% of the $100,000,000 allegedly due to the Canadians. He sues on the theory that Hutton (France) was the agent of an undisclosed principal and therefore is liable to its sub-agents for the commissions that it promised them on behalf of its principal.

### III.

### *Defendant's Version*

Although the merits of the plaintiff's claim are not now being considered, it is relevant to the question of *forum non conveniens* to look at the defendant's version of the facts in order to appraise the justice of a trial in this forum.

Bernard J. Mallet testified in his deposition that in May 1974 he was approached in Paris by a M. Andre Branche, a French citizen and chairman of Sternmark, a French company. M. Branche was acting as a representative of several French national companies, which wanted to borrow from $100 million up to $1 to 2 billion. Because the borrowers were French nation-

al corporations, the loans would automatically bear the guarantee of the Government of France. M. Branche sought Mallet's help in finding lenders.

Mallet testified that, in his search for lenders, he was introduced to Lassagne by a friend, one Blum, who in turn knew Lassagne through Pinay. Mallet testified that he had the following conversation with Lassagne:

He said he could probably provide the necessary funds to satisfy the demands of the French nationalised companies and we discussed the problem and the ways to do it, and I said "O.K. Give me the proof that you have got the funds by making evidence of the funds wherever you want and then we will sit together with the borrowers and then set up the operation. But I am not going to do anything"—I say anything—"before you give me the evidence of the funds in any bank you want as long as it is one of the top international leading banks."

In support of its contention that no loan ever closed, Hutton (France) points to an exchange of correspondence between the Canadian associates of the plaintiff and the French President and Minister of Finance, in which the Canadians were advised that no loan ever closed. On August 29, 1974, Blanchard wrote to the President of France that:

We are the attorneys for a Canadian Group whose members, known under the Code "Malka", have concluded a loan in the amount of three billion American dollars from the Kingdom of Saudi Arabia to France.

. . . . . .

[T]he Malka group put the Company, E. F. Hutton in direct contact with the representative of King Faisal, His Excellency Hassan Enani. By letter of June 24, 1974 addressed to Mr. Enani and the Saudi-Arabian Minister of Finance, Mr. Bernard Mallet sent the official confirmation that he was seeking long term loans for some French National Companies and guaranteed by national or international banks.

The loan in the amount of three billion American dollars was consummated early July 1974, but the commission agreed upon was not paid on the pretext that the said loan was concluded directly between the Minister of Finance of Saudi Arabia and the Bank of France, without any intervention or participation on the part of E. F. Hutton (France) S.A., or of its president, Mr. Bernard Mallet.

We have the firm belief of the contrary, to wit, that the Canadian Group had been the instrument by which the loan had been concluded at the request and by the intervention of Mr. Bernard Mallet, even if in the signing of the loan these persons had not been involved.

The letter requested an investigation to safeguard the honor and reputation of all those who had acted in the matter.

In response to Blanchard's letter the President of France stated in a letter of September 9, 1974, that he had referred their inquiry to the Minister of Economy and Finance. That Minister replied to the lawyers for the Malka group by the following letter of November 8, 1974:

You have informed the President of the French Republic that you are the attorneys for a Canadian group whose members, known under the code name "Malka" allegedly obtained for the benefit of France a loan of three billion U.S. dollars from Saudi Arabia, and was apparently having trouble obtaining payment of commissions which had been promised to them in this matter by Mr. Mallet, President-General Director of E. F. Hutton, France. You have asked him to intervene on your behalf. I must advise you that I am totally unaware of the transaction which you report, since neither the French government nor the Bank of France has contracted to borrow three billion dollars from Saudi Arabia.

Mallet testified that when he received a copy of Blanchard's letter it was the first time he had heard that any loan had closed. He went to the Bank of France, which clears all international financing, public or

private, and asked what happened. He was told there that no loan had closed. Mallet related this information to Lassagne, who did not believe it. So Mallet took Lassagne to the Bank of France and spoke to the head of the Foreign Department, M. Raymond. The latter told Mallet and Lassagne that he had never heard of such a loan, never heard of Hutton in any way at all connected with such a proposed loan, never heard of the involvement of any bank or governmental department in such a loan, and said indeed that the Bank would have no need of Hutton for this sort of thing because the Bank had other means of raising such funds as these. In short, they were told that no such loan ever closed.

In addition, Mallet testified that because loans to nationalized companies bear the Government's guarantee, notice of them is published in the official newspaper, the *Journal Officiel de la Republique Francaise.* No notice of such a loan was ever published.

## IV.

### Applicable Law

■ In applying the doctrine of *forum non conveniens,*[2] the Courts consider any factor that bears on the interest of the original and alternative forums in the subject matter of the suit or on the possibility in either forum of a fair, expeditious and inexpensive trial. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Schertenleib v. Traum,* 589 F.2d 1156, 1164–65 (2d Cir. 1978). When the plaintiff is an alien, and the balance of these factors is strongly in favor of trial elsewhere, the complaint must be dismissed. *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. 839; *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 450 (2d Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 378 (2d Cir. 1972).

■ When the plaintiff is an American citizen, however, the Courts have given some weight to his interest in suing in an American court, above and beyond his convenience in litigating here rather than abroad. *Swift & Co. Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 697, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Alcoa S. S. Co. v. M/V Nordic Regent,* slip op. at 5367, 5373 (2d Cir., January 10, 1979); *Leasco Data Processing Eqpt. Corp. v. Maxwell,* 468 F.2d 1326, 1344 (2d Cir. 1972); *Olympic Corp., supra,* 462 F.2d at 378. For this reason, the complaint of an American citizen should not be dismissed unless trial here would be unjust, oppressive or vexatious, rather than merely inconvenient, to the defendant. *Koster, supra,* 330 U.S. at 524, 67 S.Ct. 828; *Alcoa, supra,* slip op. at 5372; *Leasco, supra,* 468 F.2d at 1344; *Hoffman v. Goberman,* 420 F.2d 423, 428 (3d Cir. 1970); *Mobil Tankers Co. v. Mene Grande Oil Co.,* 363 F.2d 611, 614 (3d Cir.), *cert. denied,* 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966); *Thomson v. Palmieri,* 355 F.2d 64, 65 (2d Cir. 1966).

■ The Courts have recognized also, however, that an American citizen has no absolute right to sue in an American court, *Mizokami Bros. of Arizona, Inc. v. Baychem Corp.,* 556 F.2d 975, 977 (9th Cir. 1977), (per curiam) *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978); *Hoffman, supra,* 420 F.2d at 428; *Mobil Tankers, supra,* 363 F.2d at 614; *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *see also Christovao v. Unisul-Uniao,* 41 N.Y.2d 338, 339, 392 N.Y.S.2d 609, 610, 360 N.E.2d 1309, 1310 (1977) (per curiam); *Silver v. Great American Ins. Co.,* 29 N.Y.2d 356, 328 N.Y.S.2d 398, 278 N.Ed.2d 619 (1972); Bickel, *The Doctrine of Forum Non Conveniens as Applied in the Federal Courts in Matters of Admiralty,* 35 Cornell L.Q. 12, 44–45 (1949).

---

**2.** It is unsettled whether the state or federal law of *forum non conveniens* is to be applied in a diversity case. As the Second Circuit has recognized, however, the New York law of *forum non conveniens* under CPLR R. 327 is so similar to the federal law that it is unnecessary to decide which should apply. *See Schertenleib v. Traum,* 589 F.2d 1156, 1162, n. 13 (2d Cir. 1978); *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 378 (2d Cir. 1972).

■ When a danger of injustice, oppression or vexation has been found, the Courts have not hesitated to dismiss the complaints of American plaintiffs for *forum non conveniens. See, e. g., Mizokami Bros., supra; Texaco Trinidad, Inc. v. Astro Exito Navegacion S. A.,* 437 F.Supp. 331, 333–34 (S.D.N.Y.1977); *Mohr v. Allen,* 407 F.Supp. 483, 488 (S.D.N.Y.1976); *Bernuth Lembcke Co. v. Siemens Aktiengesellschaft,* 1976 A.M.C. 2175 (S.D.N.Y.1976); *Harrison v. Capivary, Inc.,* 334 F.Supp. 1141 (E.D.Mo.1971); *cf. Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir. 1978).

Moreover,

courts must consider the expansion of American business and industry in considering the application of certain traditional legal concepts to international commercial disputes. International trade by American concerns will not be assisted and may even be hindered if "we insist on a parochial concept that all disputes must be resolved under our laws and in our courts." (*Bernuth Lembcke Co., supra,* 1976 A.M.C. at 2176, *quoting The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 9, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).)

Applying these considerations to the doctrine of *forum non conveniens,* the Ninth Circuit has concluded in words that apply well here:

The plaintiff falls back on its United States citizenship as the sole and only possible basis for suing these defendants in a court of the United States. This is not enough. In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere. (*Mizokami Bros., supra,* 556 F.2d at 978)

■ In the present case, the only events that took place in New York, other than communications between the plaintiff and his associates in Montreal, were the initial meeting between Ionescu, Grae and Thiel; Grae's telephone call to Enany in New Delhi, in which Grae asked Enany about the possibility of a loan; Grae's call to Thiel in Bremen, in which Grae conveyed Ionescu's suggestion that Thiel meet Mallet in Paris; and Grae's call to or from Thiel, Enany and Mallet, in which they allegedly conspired to by-pass Ionescu and his associates. Of these events the most significant is the last. Yet France has at least as great a connection as New York with the alleged conspiratorial telephone call, since Mallet was in Paris and Thiel in either Paris or Bremen. And Mallet and Thiel, both by then in Paris, confirmed the alleged plan in a second call to Enany.

Because all of the important events in this case took place in France, the witnesses to those events are also in France. One important question is whether Hutton (France) entered into the alleged agency agreement with Lassagne; another is whether Hutton (France) authorized the plaintiff to seek the loan through Enany. On these questions the only witnesses with personal knowledge are Mallet and Lassagne, both citizens and residents of France and beyond the process of this Court. The next best witness would be Malka, the Canadian, who, as a partner of Ionescu, would testify in either France or New York.

The central question, as already indicated, is whether any loan ever closed. On this question virtually all reliable evidence is in France. The plaintiff has had for some time the letter from the Government of France and the information from the Bank of France, through which all foreign loans are cleared, stating that no such loan had ever been made. Ionescu now says that the Government of France lied when it stated that no loan was closed. Under the act-of-state doctrine, it is highly doubtful that the French Government can be questioned in the courts of this country. *See, e. g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Similarly, the alleged lenders and borrowers, other sources of reliable evi-

dence on the closing of any loan, are in France or Saudi Arabia, beyond the process of this Court.

The poor quality of the evidence that the plaintiff now says, after extensive discovery, that he could offer at trial in New York is proof of the injustice of retaining jurisdiction here. The plaintiff adduces six items of available evidence. Grae, de Rosset and Ionescu himself will testify that they heard Mallet admit on the telephone that the loan closed. The probative force (indeed, the admissibility) of Mallet's admissions, however, is thrown into doubt by the plaintiff's fourth piece of evidence, a tape recording of a conversation in which Mallet is said to have stated that the loan closed. In this conversation, Mallet asserts that he has no first-hand knowledge, but that a "Mr. Gikel [a French civil servant] confirmed it [the closing of the loan] to me." Gikel then says that he has no personal knowledge, either: "Ah, yes, I received some information: the deal is finished." Mallet is unsure even of whether the loan that Gikel told him of is the same one that Hutton (France) had sought: "I'm not absolutely sure the deal is not quite separate from ours." Lassagne then says that the deals are the same, but he does not say how he knows. The last item of evidence that the plaintiff could offer is a tape-recording of a conversation in which Lassagne—a Parisian—states from hearsay that the loan closed. But the source of his knowledge is unstated.

The Court finds that the plaintiff has chosen his forum so as to vex and harass the defendant. He has done so by selecting a forum so as to deprive the defendant of virtually all reliable evidence and knowledgeable witnesses, even though many of these could bear out the plaintiff's claims if they are true, and by resorting instead to the flimsy hearsay that happens to be available to him here. This choice of forum is simply one species of a type of vexatious litigation that the Courts have often recognized, namely, suing in a forum less convenient to the plaintiff than some other available forum in order to put the defendant to even greater inconvenience. *See e. g., Gulf Oil, supra,* 330 U.S. at 507, 67 S.Ct. 839; *Alcoa, supra,* slip op. at 5373; *Thomson v. Palmieri, supra,* 355 F.2d at 65.[3]

## V.

### *Material Injustice Involved*

If ever there was a case to be tried in France in the interest of justice, this is it. The stark fact is that the plaintiff never was personally employed by, indeed, prior to the alleged closing of an alleged loan, never had any contact with, the defendant or any person or company affiliated with the defendant, not face to face, over the telephone, or in writing. No act whatsoever of the defendant in connection with this claim took place in this country. Rather, the contact between the defendant and the chain of alleged agents that is supposed to lead to the plaintiff took place in France; the alleged loan is said to have closed in France if indeed a loan closed at all; the alleged borrowers were in France; and the Government of France, its national companies and the Bank of France all are available only in France. As a result, nearly all

---

**3.** Further evidence of the plaintiff's intent to vex or harass the defendant by his choice of forum may be found in the simultaneous filing through the same attorney of the suit docketed as 76 Civ. 5592. In that case, the plaintiffs are Ionescu's Canadian associates, Malka, Blanchard and Pacuraru. They have sued Hutton & Co., Inc., Hutton Group, Inc., and Joel Grae. Hutton & Co. and Hutton Group, the then corporate parents of Hutton (France), were not involved in the alleged loan deal but are said to be vicariously liable for the obligations of their subsidiary. The Canadian plaintiffs did not sue Hutton (France), whose primary obligation must be established before its parents are liable even under the plaintiffs' theory of vicarious liability. Presumably the plaintiffs in 76 Civ. 5592 omitted Hutton (France) because the Court would not have had jurisdiction of such a suit between aliens.

Similarly, in this case Ionescu has not sued Grae, an alleged co-conspirator, or Hutton & Co. or Hutton Group. These omissions presumably are due to the fact that Grae, like Ionescu, is a New Yorker and both Hutton Group and Hutton & Co. have their principal places of business here. Thus, the Court would have had no diversity jurisdiction.

This crazy-quilt alignment of parties is further evidence of the plaintiff's intent to vex and harass the defendant by choosing a forum where the controversy does not fairly belong.

material witnesses and records indispensable to a just trial and resolution are located in France. None of the basics of the claim or defense can be mustered in this Court. France undoubtedly has the most significant contacts with the matter in dispute and the greatest interest in adjudicating the claim and applying its law thereto. For all these reasons, the Court finds that retaining jurisdiction would pose a manifest danger of material injustice.

Accordingly, the complaint is dismissed on the conditions that (1) the courts of France have jurisdiction to adjudicate the claim asserted herein; (2) Hutton (France) and its successors or assigns appear in any action asserting the present claim filed against them in France by Ionescu; and (3) in any action asserting the present claim filed against them in France by Ionescu, Hutton (France) and its successors or assigns waive any defenses, including the statute of limitations, that they did not have at the time this complaint was filed.

SO ORDERED.