**TRANSUNION CORPORATION and Union Industries, Inc., Plaintiffs,**

v.

**PEPSICO, INC., Defendant.**

**No. 85 Civ. 10058 (EW).**

United States District Court, S.D. New York.

Aug. 7, 1986.

---

**1212**

Menaker & Herrman, New York City, for plaintiffs; Richard G. Menaker, Robert F. Herrman, Jeffrey A. Barr, of counsel.

Cravath, Swaine & Moore, New York City, for defendant; Ronald S. Rolfe, Louis M. Solomon, Jonathan D. Thier, Lawrence M. Rolnick, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs, Transunion Corporation ("Transunion") and its wholly-owned subsidiary, Union Industries, Inc. ("UII"), both Philippines corporations, commenced this action ("New York action") on December 27, 1985, against PepsiCo, Inc. ("PepsiCo"), ten days after PepsiCo had commenced an action against Transunion and others in the Philippines ("Philippines action"). Essentially the two actions center about the same transactions and claims.

PepsiCo, in addition to motions directed at the complaint as a pleading, moves: (1)

to dismiss the action on the ground of forum non conveniens; and (2) in the alternative, to stay this action pending a final decision in the Philippines action.

The claims in both actions arise out of a series of contracts entered into by the parties or their affiliates beginning in 1979. Transunion is a manufacturer of glass bottles and functions in the Philippines. In 1979, it and Pepsi Cola Bottling Company of the Philippines, Inc. ("PCBCP"), a wholly-owned subsidiary of defendant PepsiCo, entered into non-exclusive supply contracts whereby Transunion agreed to supply glass bottles to PCBCP.

On June 4, 1981, Transunion and PCBCP entered into an exclusive supply agreement under which PCBCP agreed to purchase specified minimum quantities of bottles for each year through 1986 (the "1981 Supply Agreement"). At the same time, Transunion purchased $15,000,000 of unused glass bottles in PCBCP's inventory, referred to as the "idle glass" transaction, and PCBCP guaranteed various loans to Transunion. The complaint in this action alleges the effect of these transaction was to transfer a portion of PCBCP's debt to Transunion, enabling PCBCP "to comply with Philippines regulations governing the debt-equity ratio required of foreign corporations." The complaint further alleges that in November 1982 PepsiCo disclosed that "significant accounting irregularities" had been discovered at PCBCP, which consisted, at least in part, of false reporting regarding PCBCP's bottle inventory, "facilitated by the idle glass purchase arrangement"; that as a result of the disclosures, the SEC in the United States, the SEC in the Philippines, and a grand jury in the Southern District of New York commenced investigations; and that a shareholders' class action was instituted in the Southern District of New York.

Transunion, on February 17, 1983, commenced an action against PCBCP and PepsiCo in the Philippines Regional Trial Court alleging breach of the 1981 Supply Agreement and seeking specific performance and damages. Soon thereafter, in May 1983, Carlos P. Ty, president of Transunion and a director of UII, and Fredrick Meils, the head of PCBCP and the Philippines branch of PepsiCo,[1] met in Manila where they engaged in preliminary negotiations in an effort to settle Transunion's lawsuit against PepsiCo; they were in accord at that meeting that the litigation should be resolved. Since both had engagements in the United States, they agreed to, and did, continue their settlement negotiations there, at the offices of PepsiCo in New York.[2] Meils returned to the Philippines, where drafts of the settlement agreement were sent to him, which he approved after making a number of changes. On June 17, 1983, the parties executed a compromise agreement in New York (the "1983 Compromise Agreement").

In the 1983 Compromise Agreement, Transunion, UII, PCBCP and PepsiCo agreed to exchange mutual releases releasing each other of "any and all claims" except those that might arise out of the 1983 Compromise Agreement; PepsiCo agreed to pay UII $4.5 million upon exchange of the releases; PepsiCo agreed to purchase specified amounts of glass bottles from Transunion for 1983 through 1986; the glass bottles were to "comply with glass industry AQL (acceptable quality limitations)"; and PepsiCo and PCBCP agreed to assume certain Transunion loan obligations.

On July 15, 1983, PepsiCo, PCBCP, Transunion and UII executed a release in the Philippines that expressly provided:

NOW, THEREFORE, in consideration of the foregoing, [PepsiCo and PCBCP] hereby release and waive all their rights, claims and demands against [Transunion and UII], and [Transunion and UII] also hereby release and waive all their rights, claims and demands against [PepsiCo

---

1. During the spring of 1983, the assets and liabilities of PCBCP were transferred to the Philippines branch of PepsiCo and PCBCP was dissolved.

2. According to Ty, "I informed Mr. Meils that I was myself about to leave for New York with my counsel. My counsel and I had earlier planned the trip ..." Ty Aff., para. 15.

and PCBCP], existing as of June 17, 1983, including but not limited to rights, claims and demands under the [1981 Supply Agreement and the 1983 complaint in the Philippines file by Transunion] ...

[Transunion and UII] and [PepsiCo and PCBCP] also hereby agree that as of the date hereof, the [1981 Supply Agreement and the 1983 complaint in the Philippines filed by Transunion] shall be deemed terminated and that no further rights, claims or demands shall thereafter accrue in favor of [the parties].

The parties then filed a joint motion to dismiss Transunion's complaint with prejudice which was granted by the Philippines court on July 19, 1983. PepsiCo made the $4.5 million payment to Transunion in the Philippines.

In March 1985, PepsiCo sold its Philippines bottling operations to Challenge Corporation of the Philippines ("Challenge"). The sale did not include a transfer of PepsiCo's rights and liabilities under the 1983 Compromise Agreement.

On December 5, 1985, Transunion gave written notice of its cancellation of the 1983 Compromise Agreement, upon PepsiCo's alleged breaches thereof. As already noted, on December 17th, PepsiCo commenced an action in the Philippines against Transunion, UII and others alleging breach of the 1983 Compromise Agreement in that bottles supplied by Transunion did not meet quality standards and that the defendants in that action had converted soda ash intended for delivery to PepsiCo to their own use.[3] The Philippines court granted PepsiCo a writ of preliminary attachment on the properties of Transunion and Carlos Ty.

Ten days later, on December 27th, Transunion and UII commenced this action against PepsiCo. Count One of the complaint seeks damages upon allegations that PepsiCo breached the 1983 Compromise Agreement, essentially by failing to order the quantities of bottles set forth in that agreement. It also seeks a declaration that the 1983 release of claims is null and void upon allegations of fraudulent conduct, and damages for breach of the 1981 Supply Agreement.

Count Two alleges that PepsiCo fraudulently induced plaintiffs to enter into the 1983 Compromise Agreement by representing that PCBCP "intended to continue to do business in the Philippines for the foreseeable future and would in good faith order from Transunion and UII the quantities of bottles provided for in the Agreement" and by misrepresenting PepsiCo's true motives for entering into the agreement.

Count Three of the complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")[4] and seeks treble damages in the amount of $186 million. The complaint alleges that "PepsiCo is an enterprise operating in interstate and foreign commerce" that engaged in a pattern of racketeering activity consisting of: (a) fraudulent and deceptive statements concerning the financial position of PepsiCo and PCBCP which operated as a fraud upon purchasers of PepsiCo securities; (b) a cover-up of the involvement of senior PepsiCo officials in the alleged financial misconduct with respect to PepsiCo's Philippines branch by making false statements to the SEC, the Department of Justice and the public; and (c) furtherance of the cover-up by fraudulently inducing Transunion and UII to enter into the 1983 Compromise Agreement and to terminate their lawsuit, "which lawsuit might have exposed to Transunion, UII and law enforcement officials in the United States the full extent of the senior PepsiCo executives' involvement in the Philippines financial misconduct." The defendant moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss each of the three claims, except so much of count one as alleges breach of the 1983 Compromise Agreement, for failure to

---

3. *PepsiCo, Inc. v. Transunion Corp., Union Industries, Inc., Carlos P. Ty, Filsov Shipping Corp., and Fountainhead General Marketing Corp.*, Civil Case No. 12552, Regional Trial Court, National Capital Judicial Region, Branch 147, Makati, Metro Manila, Philippines.

4. 18 U.S.C. § 1961 *et seq.*

state a claim upon which relief can be granted.

## DISCUSSION

■ Against the foregoing description of the parties' relationship, it is desirable first to consider PepsiCo's motion to dismiss the complaint on the ground of forum non conveniens. When a litigant makes such a motion the trial court must weigh the various private and public interest factors enumerated by the Supreme Court in *Gulf Oil Corporation v. Gilbert*[5] and *Koster v. Lumbermen's Mutual Casualty Company.*[6] As summarized by this Court:

> The private interest factors include the location of evidence and witnesses, the availability of process to compel attendance of unwilling witnesses, as well as other practical problems that make trial of a case easy, expeditious, and inexpensive. The public interest factors include the difficulty which arises when a forum must apply foreign choice of law rules and foreign law, the administrative problems which follow when litigation is added to existing heavy caseloads in congested centers rather than being handled at its origin, and the imposition of jury duty upon a community which has no relation to the litigation.[7]

In addition, the court must evaluate the enforceability of a possible judgment and the "relative advantages and obstacles to fair trial."[8]

■ While a plaintiff's choice of forum should rarely be disturbed and the burden is on the defendant to establish that the action should be dismissed on the ground of forum non conveniens,[9] if an alternative forum has jurisdiction to hear the case and the chosen forum is inappropriate, the court, in its discretion, may dismiss the case.[10]

No claim is made that the Philippines lacks jurisdiction to hear this case. Indeed, PepsiCo commenced an action against Transunion, UII and other defendants in the Philippines Regional Trial Court prior to the commencement of this action. It cannot be seriously disputed that the Philippines action presents the same essential issues that are at the core of this action. Any claims Transunion and UII wish to assert against PepsiCo may be asserted as counterclaims in the Philippines action. Thus, the requirement that there be an alternative forum with jurisdiction to hear the case is satisfied here.

■ The presumption in favor of the plaintiff's forum is less weighty where, as here, the plaintiffs are foreigners.[11] Plaintiffs are Philippines corporations. They have no offices in the United States and do no business in the United States. They entered into contracts with the defendant to be performed solely in the Philippines.

The 1981 Supply Agreement, which plaintiffs seek to revive by declaring the 1983 release null and void, was negotiated, executed, performed and allegedly breached in

**5.** 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

**6.** 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

**7.** *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 509 (S.D.N.Y.1982). *See also Overseas Nat'l Airways, Inc. v. Cargolux Airlines Int'l, S.A.,* 712 F.2d 11, 14 (2d Cir.1983); *Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 150–51 & n. 4 (2d Cir.1980) (en banc); *Calavo Growers of California v. Belgium,* 632 F.2d 963, 966–67 (2d Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981); *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 450–51 (2d Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 781 (1976).

**8.** *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

**9.** *See Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.,* 759 F.2d 1027, 1031 (2d Cir. 1985); *Manu Int'l, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir.1981).

**10.** *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Overseas Nat'l Airways, Inc. v. Cargolux Airlines Int'l, S.A.,* 712 F.2d 11, 13–14 (2d Cir.1983).

**11.** *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981); *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 512 & n. 17 (S.D.N.Y.1982).

the Philippines. The 1983 Compromise Agreement was negotiated both in the Philippines and in New York, executed in New York, performed in the Philippines and allegedly breached in the Philippines. All of the glass bottles covered by the 1981 and 1983 contracts were ordered, manufactured, delivered and intended for use in the Philippines. The 1983 agreement was entered into to settle litigation in the Philippines. Under both contracts, any damages suffered by plaintiffs were incurred in the Philippines.

The only connection this litigation has with New York of any significance is that three PepsiCo employees are alleged to have made fraudulent misrepresentations during the negotiations in New York leading to the signing of the 1983 Compromise Agreement. Even this connection was fortuitous. As Ty admits, it was purely coincidental that he had planned a trip to New York for the same time period Meils of PepsiCo planned to be in New York. While venue may be proper in this district under 28 U.S.C. § 1391, the Court agrees with the defendant that the Southern District of New York is not an appropriate or convenient forum for litigation of this dispute— in fact, it is a most inconvenient forum for all of the litigants.

The location of the relevant witnesses and documents favors dismissing the action. *All* of Transunion's witnesses are in the Philippines. *All* of Transunion's documents are in the Philippines. With the exception of a small number of documents pertaining to the 1981 idle glass transaction which are in New York, virtually all of PepsiCo's documents are in the Philippines. Similarly, many of PepsiCo's employees and former employees with relevant knowledge are in the Philippines. While plaintiffs assert that they would need to procure the testimony of approximately 14 present and former PepsiCo employees in the United States, the nature and relevance of their testimony is not clear from plaintiffs' papers. The only ones with clearly relevant evidence are the three individuals named in the complaint as the persons who allegedly fraudulently induced plaintiffs to enter into the 1983 Compromise Agreement—Meils, Schutzman and Cram. Moreover, PepsiCo has agreed to make its employees available in the Philippines.[12]

Plaintiffs acknowledge that there are at least four witnesses, plus several lawyers from PepsiCo's Philippines law firm, who are not under the parties' control, who reside in the Philippines and who are beyond the subpoena process of this Court. In addition, PepsiCo intends to depose or call as non-party witnesses representatives of the Philippines financial institutions involved in the 1981 idle glass transaction, representatives of the Philippines testing laboratory that performed quality tests on the bottles manufactured by plaintiffs, and Philippines damages experts.

While certainly not decisive, language may be a barrier to swift adjudication in this District.[13] Many of the witnesses who reside in the Philippines speak Tagalog, a Philippines dialect, as their primary language.

Obtaining documents and testimony from non-parties in the Philippines would require the use of letters rogatory, a time-consuming means of obtaining discovery. Discovery might be further complicated by a Philippines presidential decree, referred to as the Blocking Statute.[14] The Blocking Statute protects Philippines corporations "doing business in the pursuit of the national economic development programs of the Government and/or engaged in the development, promotion, protection and export of Philippine products to increase foreign currency revenues" by prohibiting the

---

**12.** *See* Rolfe Aff., para. 10.

**13.** *Fustok,* 546 F.Supp. at 510 ("many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District.").

**14.** Presidential Decree No. 1718, Providing for Incentives in the Pursuit of Economic Development Programs by Restricting the Use of Documents and Information Vital to the National Interest in Certain Proceedings and Processes (August 21, 1980).

removal of any document or information, unless removal is consistent with one of four practices, not applicable here, or approval is obtained from the President's designated representative. "Any person who is served or issued any requirement, order, directive or subpoena of any ... judicial authority in any jurisdiction outside of the Philippines involving said documents or information" must inform the representative of the President who then determines whether the Blocking Statute must be complied with. Violations of the Blocking Statute are punishable by up to three years in prison and/or a fine of 100,000 pesos.[15]

Plaintiffs' and defendant's experts on Philippine law dispute whether the Blocking Statute applies to the documents and testimony at issue in this litigation and to whom it applies.[16] The language of the decree makes clear, however, that the determination of whether and to whom it is applicable is made by the President's designated representative. At a minimum, the Blocking Statute would likely delay the discovery process. If the action proceeds in this District and if it is found to be applicable to the corporations involved in this litigation, the Blocking Statute could effectively bar all discovery in the Philippines.

Plaintiffs have not offered a single compelling reason with respect to their own convenience to support their choice of this forum. Indeed, plaintiffs appear to be very anxious to travel thousands of miles and to transport witness and documents to a distant forum, New York, despite the opportunity for adjudication in the Philippines, their home forum and the only place they do business. One explanation may be that plaintiffs envision their RICO claim as a powerful force to induce PepsiCo to settle.[17] It is noted that plaintiff's lengthy complaint makes free-wheeling allegations under RICO and converts a relatively simple breach of contract and fraud action into a complex one.

Public interest factors also favor dismissal of this action. As previously noted, PepsiCo commenced an action regarding the 1983 Compromise Agreement in the Philippines courts before this action was commenced. Transunion and UII, which are both named as defendants in the Philippines action, could assert their breach of contract and fraud claims against PepsiCo as counterclaims in that action. While they may not be able to assert their RICO claim in the Philippines, the mere fact that plaintiffs' potential recovery may be less in the Philippines than in the United States is not a bar to dismissal on the ground of forum non conveniens.[18] Moreover, plaintiffs' RICO cause of action, as alleged, appears to be legally deficient.[19] Accordingly, the inability of plaintiffs to bring this claim in the Philippines is entitled to very little weight.

The need to apply foreign law is a factor that weighs in favor of dismissal.[20] Plain-

**15.** See Castillo Aff., exh. 9.

**16.** Compare Castillo Aff., paras. 22–25 and Castillo Supplemental Aff., paras. 17–19 with Jardeleza Aff., para. 20.

**17.** Cf. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975).

**18.** See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 247–52, 102 S.Ct. 252, 261–64, 70 L.Ed.2d 419 (1981); Alcoa Steamship Co., Inc. v. M/V Nordic Regent, 654 F.2d 147, 159 (2d Cir.1980) (en banc); Fitzgerald v. Texaco, Inc., 521 F.2d 448, 453 (2d Cir.1975), cert. denied, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 781 (1976).

**19.** Plaintiffs have failed to plead a statutory "person" distinct from an "enterprise" as required by 18 U.S.C. § 1962(c). See Bennett v.

United States Trust Co., 770 F.2d 308, 315 & n. 2 (2d Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). In addition, plaintiffs lack standing to sue for fraud upon the purchasers of PepsiCo's securities or fraudulent statements to various governmental agencies, two of the three predicate acts alleged to support a pattern of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., —— U.S. ——, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985). Finally, the complaint fails to allege any specific mailings or wire transmissions.

**20.** See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 260, 102 S.Ct. 252, 268, 70 L.Ed.2d 419 (1981); Calavo Growers of California v. Belgium, 632 F.2d 963, 967 (2d Cir.1980), cert. denied, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981); Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir.1978); Fitzgerald v. Westland Marine Corp.,

tiffs acknowledge that Philippine law would apply to the 1981 Supply Agreement.[21] Although the 1983 Compromise Agreement was executed in New York and some of the negotiations occurred in New York, it is likely that Philippine law would apply to plaintiffs' claim of breach of that agreement. As noted previously, the contract was to be performed solely in the Philippines, was entered into to settle litigation in the Philippines, was breached, if at all, in the Philippines, and any damages were suffered by plaintiffs in the Philippines. Thus, the Philippines would appear to have the most significant contacts with and the greatest interest in the transaction.[22] The question of whose law applies to plaintiffs' fraud claim is a close one that would require further consideration and briefing by the parties if the action were to remain in this District.[23]

The parties and their experts on Philippine law vigorously dispute whether the order of dismissal with prejudice entered in the 1983 Philippines litigation upon consummation of the agreement settling that litigation is a final judgment and, if so, whether this Court is precluded from passing upon the issue. They are in agreement, however, that Philippine law governs the question of whether the order is "final" for res judicata purposes and, therefore, whether it is entitled to preclusive effect in the United States.[24] These are issues that should more appropriately be determined by the court that entered the dismissal of the 1983 action.

The simultaneous maintenance of this action and the Philippines action would be an unwarranted waste of judicial resources. As this Court noted in another case involving a foreign plaintiff suing in this District while another action was pending in a foreign forum:

> This litigation presents legal and factual issues of substantial complexity, and the sheer volume of papers already submitted on this motion with its projection of numerous issues portends an extensive and time-consuming process which necessarily would delay the normal and orderly progress of other cases involving litigants who are here as a matter of right.[25]

If the action proceeds in this forum PepsiCo will be faced with the choice of either litigating in two forums simultaneously or asserting its claims in the Philippines as counterclaims in this action. If it chooses to conserve the parties' and judicial resources by asserting counterclaims in this action, it is questionable whether it would be able to obtain personal jurisdiction over two of the defendants in the Philippines action, Filsov Shipping Corporation and Fountainhead General Marketing Corporation. More importantly, if PepsiCo prevails in this action, it cannot enforce its judgment here since Transunion and UII have no assets in this country. PepsiCo would have to bring an action in the Philippines to enforce its judgment and might have to

---

369 F.2d 499, 502 (2d Cir.1966); *Noto v. CIA Secula di Armanento,* 310 F.Supp. 639, 648 (S.D.N.Y.1970).

**21.** *See* Plaintiffs' Memorandum, at 65.

**22.** *See Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984); *Index Fund, Inc. v. Insurance Co. of N. America,* 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Speare v. Consolidated Assets Corp.,* 367 F.2d 208, 211 (2d Cir.1966); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1122 (S.D.N.Y.1982); *Ingrassia v. Shell Oil Co.,* 394 F.Supp. 875, 881–82 (S.D.N.Y.1975).

**23.** *See Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 795 (2d Cir.1986); *El Cid, Ltd. v. New Jersey Zinc Co.,* 575 F.Supp.

1513, 1515 (S.D.N.Y.1983), *aff'd mem.,* 770 F.2d 157 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 573, 88 L.Ed.2d 557 (1985); *Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 464 F.Supp. 989, 993 (S.D.N.Y.), *aff'd,* 609 F.2d 1047 (2d Cir.1979); *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

**24.** *See* Plaintiffs' Memorandum, at 24 n. 11; Defendant's Reply Memorandum, at 11.

**25.** *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 513 (S.D.N.Y.1982).

prove liability anew since foreign judgments constitute only presumptive evidence of liability and can be attacked on the ground of "clear mistake of law or fact."[26] On the other hand, if this action is dismissed and all claims are litigated in the Philippines action, Transunion and UII can either enforce a judgment in the Philippines since PepsiCo has assets in that country, or, if PepsiCo's assets are inadequate, enforce the judgment in New York.[27] So, too, if PepsiCo prevails it can enforce its judgment against Transunion, which has assets in the Philippines but none in New York.

It appears that the number of cases pending before the Philippines court in which PepsiCo's action is pending is approximately the same as the number of cases pending before judges of this District.[28] Accordingly, the relative congestion of the two forums weighs neither for nor against dismissal of this action.

Finally, in their effort to defeat defendant's motion, plaintiffs point to the uncertainty occasioned by recent political events in the Philippines and the possibility of delays in the adjudication of cases pending in the Philippines courts resulting from those events. This Court is of the view that the plaintiffs, as two Philippines corporations and whose principals are citizens of the Philippines, should not be heard to use the political situation in their own country as a bar to granting defendant's motion. A different situation might present itself if an American plaintiff raised the political situation of a foreign country as a ground for not dismissing an action brought in the courts of the United States. Here, however, the plaintiffs reside and operate in the Philippines and are protected by the laws of the Philippines. If political turmoil in a foreign country was a ground for barring dismissal of actions which otherwise do not belong in the United States, our courts would become even more popular to foreign litigants and the floodgates would be opened.[29] And finally, there is no showing that in fact the Philippines courts are not functioning at their normal pace.[30]

Defendant's motion to dismiss the complaint on forum non conveniens grounds is granted on the conditions that PepsiCo waive any statute of limitations defenses it may have with respect to the claims that plaintiffs have asserted in this action and may be advanced in the Philippines, and that PepsiCo, in accordance with its representation to the Court, make its employees available in the Philippines for trial and/or depositions.

So ordered.

26. See Castillo Aff., para. 16 (quoting Rule 39, Sec. 50 of the Philippine Rules of Court).

27. See N.Y.C.P.L.R. Art. 53 (McKinney's 1978 & Supp.1986); see also Ackerman v. Ackerman, 517 F.Supp. 614, 624 (S.D.N.Y.1981), aff'd, 676 F.2d 898 (2d Cir.1982); Fairchild, Arabatzis & Smith v. Prometco (Produce & Metals) Co., 470 F.Supp. 610, 615 (S.D.N.Y.1979); Domingo v. States Marine Lines, 340 F.Supp. 811, 815–16 (S.D.N.Y.1972); Greschler v. Greschler, 51 N.Y.2d 368, 376, 434 N.Y.S.2d 194, 198, 414 N.E.2d 694, 698 (1980).

28. See Castillo Supplemental Aff., para. 7.

29. Cf. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 252, 102 S.Ct. 252, 264, 70 L.Ed.2d 419 (1981); Noto v. CIA Secula di Armañento, 310 F.Supp. 639, 648–50 (S.D.N.Y.1970).

30. Indeed, the Court was advised by letter dated August 6, 1986, as the Court was completing its opinion, that the Philippines court recently denied Transunion's motions to dismiss that action and to discharge the writ of preliminary attachment.