**Allan B. DeYOUNG, Individually and as a Representative of a Class of Persons similarly situated as common shareholders of Dome Petroleum Limited, Plaintiff,**

v.

**John M. BEDDOME, James Howard MacDonald, Dome Petroleum Limited, Amoco Canada Petroleum Company, and Amoco Corporation, Defendants.**

**Moise KATZ, Plaintiff,**

v.

**John M. BEDDOME, James Howard MacDonald, Amoco Canada Petroleum Company, and Amoco Corporation, Defendants.**

Nos. 87 Civ. 3749 (MBM), 87 Civ. 4597 (MBM).

United States District Court, S.D. New York.

Feb. 21, 1989.

Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York City, for plaintiff DeYoung.

Robert I. Harwood, Goodkind, Wechsler, Labaton & Rudoff, New York City, for plaintiff Katz.

Mark Van Norman, Mayer, Brown & Platt, New York City, Franklin P. Auwarter, Daniel Harris, Michele Odorizzi, John M. Satalic, Mayer, Brown & Platt, Chicago, Ill., for defendants Beddome, McDonald & Dome.

Richard R. Lutz, Townley & Updike, New York City, William R. Jentes, Jean Reed Haynes, Patrick J. Ahern, Kirkland & Ellis, Chicago, Ill., for defendants Amoco Canada & Amoco.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendants in these actions are participants in a proposed transaction whereby Amoco Canada Petroleum Company ("AC"), a Canadian subsidiary of Amoco Corporation ("Amoco"), which is an Indiana entity headquartered in Chicago, proposes to buy Dome Petroleum Limited ("Dome"), a Canadian producer of oil and natural gas. The individual defendants, Beddome and MacDonald, are officers and directors of Dome.

Plaintiffs are Dome shareholders whose claims may be briefly summarized as follows: Both plaintiffs assert that the proposed transaction is unfair to Dome stockholders, in absolute terms and by comparison to what the plaintiffs say might be obtained from bidders other than AC. They deploy their claims in two directions. They charge Beddome and MacDonald with breach of fiduciary duty, waste of assets, usurpation of corporate opportunity and mismanagement for approving the Dome–AC transaction, notwithstanding that both men have filed affidavits with the Court stating that because each of them perceived a possible conflict of interest based on other business relationships, neither participated in the vote to approve the transaction. The plaintiffs charge AC and Amoco with interfering tortiously with Dome's business by discouraging other bidders, and aiding and abetting the individual defendants' alleged misfeasance.

DeYoung purports to sue individually and as a representative of a class of Dome shareholders, and alleges additionally in his First Amended Complaint a claim that a Dome proxy statement relating to election of directors failed to disclose the shortcomings in the Dome–AC deal, in violation of Section 14(a) of the Securities and Exchange Act, 15 U.S.C. § 78n(a) (1981), and Rule 14a–9 promulgated thereunder. 17 C.F.R. § 240, 14a–9 (1989). In his First Complaint, Katz sued not as representative of a class but derivatively in Dome's behalf. Both plaintiffs requested and were granted leave to amend their complaints. In his Amended Complaint, Katz has restyled his complaint as a Section 14(a) claim. Both complaints are now identical in that respect.

Defendants have moved to dismiss both amended complaints, attacking on a broad front. Dome, AC and the individual defendants have challenged the Court's personal jurisdiction over them, and Amoco has asserted AC's indispensability as a reason for dismissing the complaints against Amoco as well. All defendants have challenged the standing of both plaintiffs, albeit for different reasons. DeYoung is faulted for suing as an individual stockholder when what he seeks to redress is allegedly a wrong to Dome; Katz, who does sue derivatively in Dome's behalf, is taxed for failing to meet the prerequisites for filing such a suit. Defendants assert numerous shortcomings in the Section 14(a) claim, including that it is a mere pretext for litigating in this forum an issue of corporate governance, and argue as well deficiencies in the various state law claims. Finally, all defendants have moved to dismiss on grounds of *forum non conveniens* and principles of international comity.

For the reasons set forth below, I grant the motion to dismiss based on international comity. Accordingly, I do not reach the other grounds for dismissal asserted by defendants.

## I.

On April 17, 1987, AC and Dome executed a Memorandum of Agreement (the "Memorandum") for AC's acquisition of Dome. Both are entities incorporated under the Canada Business Corporation Act, Can.Rev.Stat. ch. 33 (1975) ("CBCA"), and have their principal place of business in Calgary, Alberta. Both individual defendants, directors of Dome, are Canadian citizens and residents.

Under the CBCA, the proposed acquisition must be approved by Dome's creditors and stockholders using procedures established in a Canadian court, and by the court itself. That process has already begun. Following four days of hearings before the Court of Queen's Bench of Alberta, that Court issued a detailed order describing procedures for presenting the Dome–AC transaction to various groups of creditors and stockholders for their approval. Those procedures have been approved by the Court of Appeal. Moreover, two Dome shareholders have sued in Alberta to delay the transaction, *N.Y. Times*, May 9, 1988, at D9, col. 3, and Dome creditors dissatisfied with the terms of the proposed acquisition have filed at least two actions challenging it in Canadian courts.

Plaintiff DeYoung filed the first of the two actions in this Court on May 28, 1987; Katz followed on June 29, 1987. In August 1987, after defendants moved to dismiss, *inter alia*, on *forum non conveniens* grounds, DeYoung amended his complaint for the first time to allege a Section 14(a) violation. That violation is said to arise from the solicitation of proxies for the election of an unopposed slate of directors at Dome's June 1987 annual meeting. Although the proxies in question were solely for election of directors, DeYoung alleged the proxy statement was materially misleading in its reference to the proposed Dome–AC transaction in that it failed to disclose (i) alleged features of the deal that were inequitable to shareholders, (ii) the virtues of competing offers for Dome, and (iii) litigation by creditors in Canadian courts challenging the transaction.

The recently amended complaints add several allegations of misrepresentations and omissions contained in Dome proxy material, dated April 26, 1988, circulated in

connection with the shareholder vote on the proposed agreement between Dome and AC. Plaintiffs allege that the proxy material (1) inaccurately disclosed Dome's negotiations with prospective acquirers other than Amoco; (2) omitted mention of a favorable provision of the TransCanada proposal that would entitle "secured creditors to approximately $1 billion in potential profits from future earnings of certain Dome assets;" (3) failed to disclose that the Primrose properties, which Amoco received an option to purchase for $79 million if the proposed transaction falls through, are worth approximately $150 million; (4) inadequately disclosed legal actions brought by certain Swiss creditors of Dome,[1] and (5) failed to state that the value of the subordinated convertible debentures Dome shareholders would receive had been reduced from $1.50 (Canadian) per common share to $1.39 (Canadian).

On July 14, 1988 the Court of Queen's Bench of Alberta approved the transaction, finding it "fair and reasonable to the shareholders of Dome." Order at 2. That Court also found that the April 26, 1988 proxy materials which Dome had provided its shareholders constituted "full, true and plain disclosure of all material facts surrounding the Plan of Arrangement." Order at 2. With all Canadian legal hurdles cleared, AC acquired Dome on September 1, 1988.

## II.

*Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895) provides the basis for applying the doctrine of international comity in federal courts, and defines it as

the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. at 164, 16 S.Ct. at 143. Thus, "Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of compe-

tent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985).

It is essential that the foreign proceeding or judgment not offend laws or public policy of the forum jurisdiction, or violate the rights of its citizens. *Cunard S.S. Co.,* 773 F.2d at 457. Here it is significant that the foreign jurisdiction involved is Canada, "a sister common law jurisdiction with procedures akin to our own." *Clarkson Co. v. Shaheen,* 544 F.2d 624, 630 (2d Cir.1976). In fact, the procedures adopted by the Court of Queens Bench in Alberta under the CBCA, and affirmed by the Court of Appeal, would seem to be if anything more protective of the rights of the shareholder plaintiffs in this case than procedures they might expect to encounter in this country. The procedures for soliciting shareholder approval required that the Plan of Approval pass by not less than two thirds of the votes cast, with similar margins of approval required of various classes of creditors. Although, as the Court of Appeal noted, "unlike a takeover or an amalgamation, an 'arrangement', strictly speaking, can be approved by the Court without the known views of these groups or, indeed, despite them[,] [w]e hasten to add that the clear duty of a court is not to approve an arrangement that is unfair to any interested party, and, almost always, the approval or disapproval of creditors or shareholders would bear on that process." Further, the court retained jurisdiction to approve the adequacy of any disclosure made during the process of soliciting approval from the various classes of shareholders and creditors. The court also directed that the vote of major shareholders with a prior commitment to approve the transaction be recorded separately so that the court could consider the relative levels of approval among groups of committed and uncommitted shareholders when the court itself passes on the fairness of the transaction. Finally, the Canadian court itself found that shareholders received full

---

1. This claim is made only by DeYoung.

disclosure and found that shareholders were fairly treated in the transaction. In these circumstances it is difficult to see how one can deny comity applying the standard that cases prescribe, taking as typical New York's standard that the transaction is "'inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.'" *Cornfeld v. Investors Overseas Services, Ltd.*, 471 F.Supp. 1255, 1259 (S.D. N.Y.) (quoting *Intercontinental Hotels Corp. v. Golden*, 15 N.Y.2d 9, 13, 203 N.E. 2d 210, 212, 254 N.Y.S.2d 527, 529 (1964)), *aff'd*, 614 F.2d 1286 (2d Cir.1979).

Against these considerations plaintiffs place in the balance their claim under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a) (1981), and Rule 14a–9 promulgated thereunder, and argue that we should not risk compromise of federally protected rights by relegating these plaintiffs to Canadian courts that might not protect them. Furthermore, they argue that the Canadian court's decision should not be accorded comity here because it did not necessarily decide issues of full disclosure.

Defendants cite *Canada So. Ry. Co. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883) for the proposition that a foreign judgment must be accorded comity even when the claims involve federally-protected rights. In *Gebhard*, New York plaintiffs brought an action to recover on the bonds of a Canadian railroad company undergoing reorganization in Canada. The Supreme Court barred the action and ruled that the plaintiffs were bound by the Canadian reorganization, which had been approved by the Canadian Parliament. *Gebhard* does not uphold defendants' broad proposition because it was also premised on the recognized necessity that bankruptcy decrees bind all claimants—wherever they may be. *See, e.g., Cunard Steamship Co.*, 773 F.2d at 458 ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.")

Defendants also cite a Third Circuit decision, which applied principles of international comity in a securities action. In *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 132, 34 L.Ed.2d 126 (1972), the court ruled that the fairness of a corporate amalgamation could not be challenged in federal courts because it had been decided by a Zambian court. However, the court distinguished allegations that defendants had failed to make full disclosure and held that such allegations could be properly heard by the district court. Although *Kohn* does hold that comity may be applicable to securities claims, the opinion reflects a legitimate concern that claimants asserting federally protected rights not be made to depend on the vagaries of another country's laws which might not protect them as fully as our own. *See, e.g., Pogostin v. Pato Consolidated Gold Dredging, Ltd.*, [1981 Transfer Binder] (CCH) Fed.Sec.L.Rep. ¶ 97,922 at 90,-699; ¶ 98,012 at 91,237 (S.D.N.Y.1981) [1981 WL 1613]. No such concern is present here, however, because not only did the foreign court fully and fairly decide the actual issue in dispute, but the law of the foreign jurisdiction affords plaintiffs substantive rights similar to those they have here, with comparable standards of proof.

Although plaintiffs assert that Canadian law is less advantageous to them than the law that would be applied were the case to remain in this Court, they have made no showing that Canadian law does not afford them a cause of action to pursue their claims there. To the contrary, plaintiffs accept that "CBCA § 185.1 [was] never intended by the Canadian legislature to impede the ability of public shareholders or a company from [*sic*] exercising their recognized right to seek relief for the type of injuries alleged in plaintiffs' amended complaints." Pltfs' Mem. at 33. Plaintiffs also concede that the "shareholder oppression" remedy under § 234 of the CBCA "has been defined quite broadly by Canadi-

an courts to include any conduct by directors containing some element of unfairness, including the failure to adequately disclose material information to shareholders." *Id.* at 31. Finally, plaintiffs admit that "all corporate statutes in Canada that provide for oppression remedies also provide for corporate derivative actions brought by shareholders with the consent of the Court on behalf of their corporation for wrongs done to the corporation." *Id.* at 30. The defendants also cite Canadian cases and statutes reflecting the existence of class and derivative forms of action analogous if not identical to those in the United States. Another court, canvassing the applicable Canadian law on shareholder derivative suits, found that Canadian law provided rights similar to that afforded by United States law. *Fleeger v. Clarkson Co.*, 86 F.R.D. 388, 392–393 (N.D.Tex.1980).

Moreover, plaintiffs have not contested that the "full, true and plain disclosure" standard set by the Canadian judge is at least as stringent as that required by Section 14(a).

Rather, plaintiffs' main objection to Canadian case law governing securities class actions and derivative actions seems to be that it does not permit contingent fee arrangements. But even if I were to assume *arguendo* that Canadian procedures are less favorable to the plaintiff than those in this Court, including particularly the unavailability of contingent fees in Canada, such factors have been found, in the context of *forum non conveniens*, not persuasive. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 102 S.Ct. 252, 261, 70 L.Ed.2d 419 (1981); *Ledingham v. Parke–Davis Div. of Warner Lambert Co.*, 628 F.Supp. 1447, 1449–50 (E.D.N.Y.1986) (contingent fees unavailable in Canada; action dismissed nonetheless on *forum non conveniens* grounds because Canadian forum was available). There is no reason to accord that minor failing any greater weight in applying principles of international comity.

Accordingly, Canadian law provides causes of action that are the same in all significant respects as those available under United States law. Plaintiffs could have sought relief in Canadian courts, and may still do so, provided of course that Canadian principles of collateral estoppel would not bar such a suit.

Whether the prior judgment satisfies all the requirements of collateral estoppel under Canadian law need not be decided here, however. That decision is best left to the Canadian courts. Nevertheless, I find that the issue of full disclosure was sufficiently considered by the Canadian court so as to invoke international comity principles. Although plaintiffs vigorously dispute this question, my review of the Canadian proceedings convinces me that the issue of full disclosure was actually decided by the Canadian court. I have already described the procedures by which the Canadian court ensured that the corporation provided shareholders with full disclosure. In addition, in its July 14, 1988 judgment, the court specifically stated that it was "satisfied that in the Notice of Special Meeting, Notice Concerning Application and Information Circular and Proxy Statements of Dome dated April 26, 1988 Dome has provided the shareholders of Dome with full, true and plain disclosure of all material facts surrounding the Plan of Arrangement as regards the shareholders of Dome in accordance with the Interim Order." Order at 2. Those are the same disclosure documents challenged in the actions at bar. In *Kohn*, where the Zambian court took only three hours to reach its decision, *Kohn*, 458 F.2d at 304 (Adams, J., concurring and dissenting), there was concern implicit in the court's opinion that the foreign court had not really addressed the issues in the case. There is no basis for such concern here. Rather, the Canadian courts provided procedures to ensure, and then fully reviewed, the extent to which Dome disclosed all information to shareholders.

### III.

■ When motions to dismiss were first filed, I found compelling defendants' arguments to dismiss on grounds of *forum non conveniens*. Although in the interim the Canadian court's decision has altered the

dispositive issue here to one of comity, principles of *forum non conveniens* would support the result here. *See, e.g., Banco Metropolitano, S.A. v. Desarrollo de Autopistas y Carreteras de Guatemala, S.A.,* 616 F.Supp. 301, 305 (S.D.N.Y.1985) (noting complementary *forum non conveniens* and international comity principles warranting dismissal). As defined in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and summarized in *Reyno,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6, the criteria that doctrine provides for choosing between available forums relate to the private interests of the litigants—primarily convenience in gaining access to documents and witnesses for discovery and trial, and the public interest—including the " 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* (citations omitted)

Although a trial court should not grant a *forum non conveniens* motion "unless the balance is strongly in favor of the defendant," *Gulf Oil Corp.,* 330 U.S. at 508, 67 S.Ct. at 843, in *Koster v. (American) Lumbermens Mutual Casualty Co.* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), decided the same day as *Gulf Oil Corp.,* the Supreme Court held that a plaintiff's choice of forum weighs far less heavily in a case such as this where plaintiffs sue strictly in a representative or derivative capacity. Plaintiffs in such a case have only a small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions. In such a case, the plaintiffs who actually sue, like Messrs. Beddome and Katz, do not claim to be witnesses to anything other than their ownership of an interest in the dispute and their desire, and that of their lawyers, to represent others similarly situated. *Koster,* 350 U.S. at 523–27, 67 S.Ct. at 831–33. Such a case will often turn on events that occurred in a jurisdiction other than where the plaintiff

lives, on evidence to be sought from witnesses and documents in such other jurisdiction, and on the law of such other jurisdiction. *See, Koster,* 350 U.S. at 523–27, 67 S.Ct. at 831–33, and *Fogel v. Wolfgang,* 48 F.R.D. 286, 290 (S.D.N.Y.1969), and cases cited therein.

Four of the five defendants in this case are domiciled in Canada. The acts of Dome's board challenged by plaintiffs took place in Canada. The agreement being challenged was negotiated between two Canadian corporations, and signed, in Canada. The underlying Dome documents are located in Canada. Indeed, the only location outside Canada where the parties have plausibly suggested any documents might be found is Chicago, where Amoco has its headquarters.

At oral argument, plaintiffs' counsel hypothesized that investment and commercial bankers in New York "controlled and made the decisions, and that is when those decisions were made." 4/18/88 Tr. 49. There is not a single allegation in either complaint to that effect, and not one of those unspecified bankers has been named as a defendant in either action. To the contrary, the gravamen of both complaints is that Dome stockholders are being injured by the misconduct of Dome's board, aided and abetted by Amoco and AC. To the extent that the alleged misconduct involves rejecting bids from likely suitors, the only two identified in the complaints, whose representatives presumably would testify to the advantage they offer over AC, are Trans Canada Pipelines Limited and Imperial Oil Limited— both Canadian entities.

Plaintiffs note also that Dome's transfer agent, the Bank of New York, distributed to stockholders certain interim reports regarding the Dome–AC deal. But even if those reports played some role in the alleged impropriety, there is no suggestion that witnesses whose testimony bears on the content of the reports are to be found in New York. The transfer agent's role in their distribution is utterly insignificant in any evaluation of where the lawsuit should proceed.

Nor can I attach great weight to plaintiffs' claim that Dome's stock is traded on a registered securities exchange in this District and many of its stockholders are U.S. citizens. " '[P]arties who choose to engage in international transactions ... cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere.' " *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F.Supp. 122, 129 (S.D.N.Y.1986) (quoting *Ionescu v. E.F. Hutton & Co. (France) S.A.*, 465 F.Supp. 139, 145 (S.D.N.Y.1979)), *aff'd*, 812 F.2d 712 (2d Cir.1987).

Where the plaintiffs' substantive contribution to the litigation and the evidence to be found in this jurisdiction are both nil, where no potential witness in the litigation who may be unwilling to attend a trial is subject to this Court's process, and where discovery of third parties in Canada (*e.g.* Trans Canada and Imperial) would have to be conducted by cumbersome letters rogatory,[2] it is downright perverse to argue that there is anything close to equal convenience in trying this case here or in Canada, modern communications notwithstanding. *Cf., Transunion Corp. v. Pepsico, Inc.*, 640 F.Supp. 1211, 1216, (S.D.N.Y. 1986) (Weinfeld, J.) (location of witnesses and documents in Philippines, and need to use letters rogatory for discovery, all favored dismissal on forum non conveniens grounds), *aff'd*, 811 F.2d 127 (2d Cir.1987).

The public interest factors present here weigh, if possible, even more heavily in favor of having this case decided in Canada. There is little doubt that, applying New York choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Canadian law would govern the common law claims relating to corporate governance of Dome that are at the heart of both complaints. Dome, a Canadian corporation that conducts its operations in Canada, is that country's second largest producer of natural gas and third largest producer of crude oil.

Under the governmental interest test that prevails to determine choice of law in New York, Canadian law would control issues of corporate governance here. That would compel this Court to apply an unfamiliar body of law, a prospect that argues strongly for dismissal. *Piper Aircraft*, 454 U.S. at 260, 102 S.Ct. at 268; *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir.1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981); *Transunion Corp.*, 640 F.Supp. at 1217.

Again, the interest of Canada in having controversies relating to one of its major corporations decided at home is substantial. That consideration, as well, supports dismissal. *Gulf Oil Corp.*, 330 U.S. at 509, 67 S.Ct. at 843. In this case, Canada's government and courts have already taken an active role over the subject matter of this dispute. Two agencies of the Canadian government approved the transaction, and the Court of Queen's Bench of Alberta, in Calgary, determined, after four days of hearings, just how Dome was to go about securing the approval of its creditors and shareholders before the proposed deal with AC could be consummated. Notably, two-thirds approval by stockholders was necessary before the transaction could be effected. As mentioned above, litigation was commenced in the Canadian courts to challenge the transaction. Finally, the Canadian courts have found that Dome fully disclosed all pertinent information to shareholders and that the transaction was fair. It would be highly intrusive for this Court to involve itself in a matter that has so heavily engaged the attention of both the executive and judicial authorities of Canada.

In addition, although this Court's unfamiliarity with Canadian law extends also to docket conditions in Canadian courts and the parties have offered us no proof on the subject, docket congestion in this Court is a persistent affliction. That, too, is a factor to consider in deciding whether to accept a

2. This is reflected in a memorandum distributed by the Overseas Citizens Services section of the

United States Department of State.

case that can be litigated elsewhere. *Piper Aircraft Co.*, 454 U.S. at 252, 102 S.Ct. at 264.

Although the standard for dismissing, on *forum non conveniens* grounds, a claim brought by a citizen of this country is extreme inconvenience and the clear prospect of material injustice, *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1344 (2d Cir.1972) (Friendly, J.), that test is met here.

## IV.

In sum, I find that considerations of international comity mandate dismissal here. Moreover, this result is fully in accord with principles of *forum non conveniens.* Accordingly, defendants' motions for summary judgment are granted, and the complaints are dismissed.

SO ORDERED.