**DELBRUECK & CO., Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY, Defendant.**

**No. 76 Civ. 2273 (VLB).**

United States District Court,
S. D. New York.

Jan. 11, 1979.

Fox, Glynn & Melamed, New York City, for plaintiff.

Simpson, Thacher & Bartlett, New York City, for defendant.

## OPINION

VINCENT L. BRODERICK, District Judge.

### I

### *Introduction*

This action arises out of the transfer of funds of plaintiff Delbrueck & Co. ("Delbrueck") by defendant Manufacturers Hanover Trust Company ("Manufacturers") to The Chase Manhattan Bank, N.A. ("Chase") for the account of Bankhaus I.D. Herstatt, K.G.a.A. ("Herstatt") on June 26, 1974.

Shortly before the funds left Manufacturers, Herstatt was formally ordered closed by the German banking authorities. This action concerns that closing, its impact with respect to contractual obligations between Delbrueck and Herstatt, and the actions taken by plaintiff, defendant, and Chase in the wake of the closing.

Delbrueck charges Manufacturers with negligence a) in transferring the funds when it knew or should have known of the action that had been taken with respect to Herstatt; and b) in failing to reclaim the funds from Chase. Delbrueck seeks damages in the amount of $5 million.[1]

Delbrueck is a private German banking partnership with a principal office in Cologne. Manufacturers is a New York banking corporation with a principal office in New York City. Jurisdiction exists under 28 U.S.C. § 1332(a)(2).

A bench trial was held before me. This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### II

### *Facts*

For many years prior to June 26, 1974, Delbrueck was a customer of Manufacturers and maintained an account with Manufacturers in New York City. Manufacturers was a paying and receiving bank for Delbrueck in the United States and, as such, was responsible for receipt and transfer of United States dollars upon instructions from Delbrueck.

On June 14, 1976, Delbrueck entered into two foreign exchange contracts with Herstatt. The two contracts provided for delivery by Delbrueck, on June 26, 1974, of $10 million and $2.5 million, respectively, in exchange for an agreed upon amount of German marks to be delivered by Herstatt to Delbrueck. The dollars were to be paid by Manufacturers to the Herstatt account at Chase in New York, and the German marks in exchange were to be paid in Hamburg into Delbrueck's account at the German state central bank.[2] On June 25, 1974 at 6:10 p. m.[3] Delbrueck sent to Manufacturers a telex payment order directing the transfer on June 26, 1974 of the $12.5 million to the Herstatt account at Chase.[4]

A separate foreign exchange contract required payment of $10 million by Delbrueck to Herstatt on June 27, 1974. Early on June 26, 1974 Delbrueck sent to Manufacturers a telex payment order directing the transfer on June 27, 1974 of the $10 million to the Herstatt account at Chase.

Events of June 26, 1974 significant to this action are outlined in the following table:

| | |
|---|---|
| 10:34 a. m. | The German ticker service carried news of the Herstatt closing. |
| 10:35 a. m. | Chase (Knippenberg) learned of Herstatt's failure; the Herstatt account at Chase was frozen. |
| 10:45 a. m. | Delbrueck (Axel Momm) in Cologne learned of the Herstatt closing. |

1. $12,500,000 was transferred. Delbrueck recovered approximately $7.5 million from Herstatt under, *inter alia*, German composition procedures and a related New York creditors' agreement.

2. About 6:00 a. m. (New York time) on June 26, 1974, Herstatt paid to the Landeszentralbank in Hamburg, for the account of Delbrueck, the 31

million deutsche marks Herstatt was required to pay by the terms of the two June 14, 1974 foreign exchange contracts.

3. All times are given as New York time.

4. It was Delbrueck's custom and practice to issue its payment orders on the day prior to the date payment was to be made.

11:15 a. m. — Herstatt was formally ordered closed by telex from the German authorities.

11:30 a. m. — Delbrueck sent a telex to Manufacturers, instructing Manufacturers not to pay to Chase for the account of Herstatt the $10 million which was due on June 27, 1974.

Shortly after 11:30 a. m. — Manufacturers (Binder) learned of the Herstatt failure by telephone from Manufacturers' Frankfurt office (Rosencranz).

11:36 a. m. — Manufacturers released $10 million which was due on June 26, 1974 to Chase for Herstatt through the CHIPS system (see *infra*).

11:37 a. m. — Manufacturers released $2.5 million which was due on June 26, 1974 to Chase for Herstatt through the CHIPS system (see *infra*).

12 noon — Manufacturers (Binder) received a telephone call from Delbrueck (Georgius), directing it to stop the transfer to Chase of $12.5 million due to Chase for the account of Herstatt on June 26, 1974.

12:10 p. m. — Seeking to stop the transfer to Chase, Binder telephoned Manufacturers Payment & Receiving Department (Meehan).

12:35 p. m. — Manufacturers received a confirming telex from Delbrueck with respect to stopping the transfer of $12.5 million.

12:45 p. m. — Payment order for the $12.5 million was located at Manufacturers. Meehan advised Binder that the transfer of the $12.5 million had been made.

Meehan telephoned Cacchioli at Chase to ask for return of the Delbrueck funds; Cacchioli was not available. Meehan contacted Marrone at Chase.

12:51 p. m. — Manufacturers advised Delbrueck by telex that the $12.5 million payments had been made.

1:00–2:00 p. m. — Manufacturers personnel continued to try to speak with officers at Chase in attempts to effect the return of the Delbrueck funds.

1:15 p. m. — Delbrueck (Georgius) again telephoned Manufacturers (Meehan) with respect to stopping the transfer of the $12.5 million.

1:30 p. m. — Manufacturers (Meehan) attempted to telephone Chase (Marrone) to request return of the $12.5 million.

2:00 p. m. — Chase informed Manufacturers that the matter "is in hands of the legal department" and that Chase would not return the funds at that time.

After 2:00 p. m. — Delbrueck (Georgius) spoke to Chase personnel (*e. g.*, Gebbe and Knippenberg) and was informed that Chase would not return the funds.

Manufacturers (Meehan) informed Delbrueck (Georgius) that nothing more could be done.

9:00 p. m. (approx.) — Chase credited the Herstatt account with $12.5 million.

On July 10, 1974, *i. e.*, two weeks later, Manufacturers delivered to Chase a letter requesting the return of the $12.5 million. Chase did not return the funds.

### III

### CHIPS

The New York Clearing House Association ("Clearing House") maintains computer facilities and implements techniques for the transfer of funds among its member banks. In June, 1974 the Clearing House was using the Clearing House Interbank Payments System ("CHIPS"), a computerized interbank system for the transfer of funds involving international customers of Clearing House member banks. Manufacturers and Chase were member banks of the Clearing House and participants in CHIPS.

The CHIPS system eliminates checks for interbank transfers. Under it, funds are transferred electronically through a central computer located at the Clearing House with connecting terminals located at the member and associate member banks.[5]

5. The mechanics of effecting an interbank payment under the CHIPS system are as follows: When the paying or sending bank (Manufacturers) receives a telex from one of its customers (Delbrueck) instructing it to make a payment to a receiving bank (Chase), another member of the CHIPS system, for the account of one of the receiving bank's customers (Herstatt), the paying bank (Manufacturers) first tests and verifies the telex. Thereafter, the tested and veri-

fied telex is sent to one of the CHIPS computer terminal operators and the payment order contained in the telex is programmed into the terminal by typing into the computer the relevant information—*i. e.*, the identifying codes for the party originating the transfer (Delbrueck), the remitting bank (Manufacturers), the receiving bank (Chase), the party for whom the receiving bank is receiving the transfer (Herstatt) and the amount of the transfer ($10 million and

## IV

### Choice of Law

■ Since this is a diversity case, this court must apply New York law, including its conflicts of law rules, in determining the law to be applied. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ The choice of law principles of New York have been developed for torts actions in a line of cases following *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). Choice of law is determined by a government interest analysis, *i. e.*, which forum has the most significant relationship with the facts and parties; which forum has a greater interest in having its policies, as reflected in the relevant law, applied?

■ Of the players in this drama, both defendant Manufacturers and Chase are banks which have their principal places of business in New York. Although plaintiff Delbrueck and Herstatt are private German banks, they transacted business in this forum through Manufacturers and Chase, respectively. The acts and omissions by Manufacturers which Delbrueck alleges constituted negligence occurred in New York.[6] The relevant and significant computer system, CHIPS, operated in New York. New York has a greater interest in the resolution of this case than does Germany.

## V

### Manufacturers' Transfer of Funds

■ I find that Manufacturers is not liable for negligence in transferring the $12.5 million from the account of Delbrueck to Chase for the account of Herstatt.

Delbrueck's claim that Manufacturers should have shut down Manufacturer's entire CHIPS system when Manufacturers learned of the Herstatt bank failure shortly after 11:30 a. m. is untenable. Through its CHIPS system, Manufacturers serviced many customers, and it could not reason-

---

$2.5 million). This information is then transmitted to the central computer located at the Clearing House, which, based upon the identifying codes searches out all the necessary clerical information, stores the message and causes a sending form to be automatically typed at the sending bank. In this case, this step was effected on June 25, 1974.

Once the programming of the computer has been completed, the send form is sent to the appropriate area at the sending bank for approval. When a determination is made at the sending bank (Manufacturers) to make the payment, the form is returned to one of the computer terminal operators, reinserted in the computer and the release key is depressed. At that moment, the central computer at the Clearing House causes a credit ticket to be printed automatically at the terminal of the receiving bank (Chase) and a debit ticket to be printed at the terminal of the sending bank (Manufacturers). Further, the central computer automatically makes a permanent record of the transaction and debits the Clearing House account of the sending bank and credits the Clearing House account of the receiving bank. In this case, this step was effected at 11:36 and 11:37 for the $10 million and $2.5 million payment, respectively, from Manufacturers for Delbrueck to Chase for Herstatt.

The funds received by a receiving bank (*e. g.*, Chase) for the account of one of its customers (*e. g.*, Herstatt) via the receipt of a CHIPS credit message are made available to the customer and can be drawn upon by the customer in the discharge of its obligations that same day, as soon as the receiving bank is aware of the fact that the funds have been received. This running tabulation by the receiving bank is generally referred to as a "shadow balance."

At the end of the day, the central computer correlates all of the day's transactions, nets out the debits and credits, and prints out reports showing which banks owe money and which have money due them. That information is delivered to the New York Federal Reserve Bank the next business day and adjustments are made on the appropriate books of account.

6. Manufacturers contends that it had no duty of care for the benefit of Delbrueck. I assume, for the purpose of this action, that Manufacturers did have a duty of care, a duty "to exercise the care of a reasonable [banker] as to what [it did] or [did] not do" with respect to the position of the depositor Delbrueck. W. Prosser, *The Law of Torts*, ¶ 53 (4th ed. 1971). I note in this regard that Manufacturers was not managing Delbrueck's funds *vis a vis* Chase or Herstatt; rather Manufacturers was receiving and implementing payment orders issued by Delbrueck.

ably have been expected to place in jeopardy the contracts of its customers by a shutdown of its CHIPS transfers.

I find that Manufacturers was not negligent in transferring the $12.5 million on June 26, 1974. I dismiss out of hand the suggestion that negligence can be predicated on Manufacturers' failure to learn of Herstatt's closing prior to 11:30 a. m. Someone at Manufacturers learned of the Herstatt failure approximately six minutes before the transfer was made; it is not reasonable to conclude that Manufacturers was negligent because notice of the Herstatt failure did not reach the Payment and Receiving Department within that six-minute time span. I also note that, at 11:30 a. m. on June 26, Delbrueck directed Manufacturers, by telex, not to pay the $10 million due June 27, but made no mention of the payments due June 26 which are at issue. Manufacturers reasonably could have assumed that Delbrueck, for reasons known only to Delbrueck, wished to go ahead with the June 26 transfer. (Herstatt had already performed its obligations under the June 14 contract for exchange on June 26. (*See* note 2)).

■ In any event, even if Manufacturers had been negligent in making the CHIPS transfers, liability could not be predicated upon that negligence because of Delbrueck's contributory negligence during the morning hours of June 26, 1974.

Delbrueck's cause of action in this case arose prior to September 1, 1975. I must therefore apply the rule of contributory negligence. N.Y.C.P.L.R. § 1413 (McKinney 1976).

"Contributory negligence is conduct on the part of the plaintiff, contributing as a

legal cause to the harm he suffered, which falls below the standard to which he is required to perform for his own protection. . . . [T]he plaintiff is denied recovery because his own conduct disentitles him. . . ." W. Prosser, *The Law of Torts* ¶ 65 at 416–17 (4th ed. 1971).

Delbrueck learned of the Herstatt bank failure at 10:45 a. m., yet Delbrueck did not correspond with Manufacturers until 11:30 a. m. Moreover, in its first contact with Manufacturers, at 11:30 a. m., Delbrueck instructed Manufacturers to cancel the transfer to Chase for Herstatt scheduled for June 27, 1974. It made no references to the transfer at issue here, scheduled for June 26. Delbrueck's failure to refer, explicitly or generally, to cancellation of these transfers constituted negligence.[7]

## VI

### *Manufacturers' Efforts to Obtain a Refund*

■ I find that Manufacturers is not liable for negligence in its efforts to obtain from Chase a refund of the $12.5 million transferred on June 26, 1974.[8]

■ Plaintiff asserts that the failure of Manufacturers to invoke its rights under various rules of CHIPS and of the Committee on International Banking evidences defendant's negligence. Plaintiff has misapprehended these rules and there was no negligence on Manufacturers' part in not proceeding as Delbrueck now suggests.

Rule 8 of the CHIPS rules provides that, on the day following the release of CHIPS payments by an associate member bank, a Clearing House member may refuse to accept the debit position of the associate

---

7. For example, Delbrueck did not even direct Manufacturers to cancel "any outstanding payment orders for the benefit of Herstatt." The fact that Delbrueck cancelled *only* a June 27, 1974 payment order may reasonably have been interpreted by Manufacturers as an instruction to proceed with all other outstanding payment orders regarding Herstatt.

8. Delbrueck complains that the Manufacturers' personnel who were involved in attempting to

persuade Chase to return the funds were not of sufficiently high rank within Manufacturers. I reject this claim. The Manufacturers personnel who were involved were experienced, competent people. For example, Mr. Joseph Meehan, who called appropriate Chase personnel, was, on June 26, 1974, an assistant vice president in the Operations Department of Manufacturers International Division; he was fully familiar with the operation of the CHIPS system.

member on whose behalf it is making settlements. CHIPS rule 8 has no application in the instant case: both Manufacturers and Chase were Clearing House members, and no associate member was involved in the transactions of June 26, 1974.[9]

Rule 9 of the CHIPS rules provides for situations in which the mechanisms of the CHIPS system generate an error. This rule applies only to those circumstances in which the system itself—*i. e.*, the computer or its software—causes an error—*e. g.*, where the system fails to print out the credit message or the system accidentally deletes a message which was in fact released. This rule has no application to this case.

Administrative Procedure No. 2 of CHIPS provides:

The rules pertaining to the CHIPS System regarding errors are applicable only to System generated errors. All other types of errors are to be referred to the C.I.B. rules on adjustment of payments in error.

■ The Committee on International Banking ("C.I.B.") rule on the Adjustment of Payments Made in Error provides for the retransfer of funds to a sending bank where there has been an error, provided the bank seeking the refund furnishes the receiving bank with a written admission of error and a satisfactory letter of indemnity. The errors dealt with in the C.I.B. rules are errors of a clerical nature on the part of the

sending bank (here, Manufacturers). These rules apply only to errors committed by the sending bank, such as the making of a payment (a) on the wrong date, (b) to the wrong receiving bank, (c) in the wrong amount, or (d) to the right receiving bank but for the wrong account. Thus, this C.I.B. provision would become applicable in this action only if there had been an error of a clerical nature on the part of Manufacturers in connection with the making of these payments. Manufacturers made no such error; it executed the payment orders as directed by Delbrueck.[10]

Delbrueck argues that if Manufacturers had delivered to Chase a written revocation of the transfer before 9 p. m., when the funds formally were credited by Chase to the Herstatt account, Chase would have been obligated, under common law, to return the funds. Manufacturers argues that Chase would have refused a written revocation of the transfer and would not have returned the funds. However, the position taken by Delbrueck is, in effect, that, had there been a timely written revocation, Delbrueck could have successfully brought suit against Chase on the written revocation. Manufacturers contends that a CHIPS transfer is the legal equivalent of a cashier's check and that under Article 4 of the Uniform Commercial Code, revocation was impossible; therefore Delbrueck could not have prevailed in an action against Chase and, as a matter of law, lack of written demand cannot be deemed negligence.

9. Associate Members are banks which are not Clearing House members. Associate Members do not maintain accounts with the Clearing House and they settle their net balances resulting from a day's transactions through a designated member bank. The Associate Member, however, does have its own CHIPS computer terminal, and it is free to make payments, via the release of CHIPS credit messages, as it sees fit. The designated Clearing House member is not advised or consulted with respect to the Associate Member's activities until after the close of the CHIPS system for the day, at which point the designated member is advised of the Associate Member's debit position. Since the designated Clearing House member is using its own funds when it settles on behalf of an Associate Member, Rule 8 is designed to allow Clearing House members the opportunity to make a credit decision before settling its

own funds. Rule 8 has no relevance to the refusal of a CHIPS member to honor a payment message which it *itself* has released because in the latter instance the CHIPS member already has had the opportunity to make a credit decision.

10. Nor can Delbrueck claim that Delbrueck made an error of the type covered by these rules. Delbrueck intended to have Manufacturers pay Chase for the account of Herstatt and that is precisely what occurred. Further, the C.I.B. rule itself specifically provides that "[i]t is the spirit of this rule that no member shall be unjustly enriched as the result of an error by another member." Delbrueck cannot claim the benefit of this rule because the rule by its terms indicates that it is applicable only to errors by member banks.

I find that Manufacturers was not negligent. As an agent it kept its principal, Delbrueck, informed of the steps it was taking and followed directions from Delbrueck with respect to other steps to take.

However, even if Manufacturers had been negligent in failing to make written demand on Chase on June 26, liability could not be predicated upon that negligence because of Delbrueck's contributory negligence.

As discussed in Section V, *supra*, Delbrueck was contributorily negligent if its conduct, which contributed as a legal cause to the harm it suffered, fell below the standard required of it for its own protection.

Delbrueck personnel knew, before Chase formally credited the $12.5 million to the account of Herstatt, that Chase was taking the position that it would not return any funds. Mr. Sig Binder of Manufacturers gave this information to Mr. Georg Georgius of Delbrueck via telephone. Mr. Georgius thanked Mr. Binder for the efforts made by Manufacturers and suggested that Manufacturers continue its endeavor. Mr. Georgius, who was advised by counsel who was "deeply involved in all of this,"[11] did not instruct or suggest to Manufacturers that Manufacturers deliver to Chase a written revocation of the transfer. Moreover, although Mr. Georgius himself spoke on behalf of Delbrueck to several Chase personnel about a refund, Delbrueck itself did not send to Chase a written revocation of the transfer.

I find that Delbrueck was contributorily negligent by its failure either to direct Manufacturers to deliver to Chase a written revocation of the transfer, or, as the principal on whose behalf the transfer was made, to send to Chase a written revocation, *e. g.*, by telex.

## VII

The action is dismissed.

SO ORDERED.

---

11. Transcript at 248.