**Louis GLAZER, M.D., Plaintiff–Appellee,**

v.

**FIRST AMERICAN NATIONAL BANK, Defendant–Appellant.**

Supreme Court of Tennessee, at Jackson.

Sept. 16, 1996.

Petition for Rehearing Denied Oct. 28, 1996.

Henry L. Klein, Apperson, Crump, Duzane & Maxwell, Memphis, for Plaintiff–Appellee.

Gary L. Jewel, Jewel & Rich, Memphis, for Defendant–Appellant.

## OPINION

DROWOTA, Justice.

In this case involving a claim for conversion under § 47–3–419 of the Tennessee Uniform Commercial Code (UCC), the defendant, First American National Bank (FANB), appeals from the Court of Appeals' affirmance of the trial court's judgment in favor of the plaintiff, Louis Glazer, M.D. The sole issue for our determination is whether the trial court's award of consequential or special damages to Glazer was proper under the facts of this case. For the reasons that follow, we hold that the award was not proper. Therefore, the judgment of the Court of Appeals is reversed.

### FACTS AND PROCEDURAL HISTORY

The facts of this case are relatively straightforward. In early 1989 the plaintiff Louis Glazer, an anesthesiologist practicing in Memphis, opened multiple business accounts with the defendant FANB. One of those was a business checking account, and Dr. Glazer was the only person listed on the signature card as having authorization to sign checks on that account.

In March 1989, Dr. Glazer hired Beverly Brinkley to process checks written by insurance companies on behalf of his patients. Brinkley's duties included receiving the checks as they came into the office; updating the patient records on the office computer so as to reflect the payment received; and then depositing the checks, which were always made payable to Dr. Glazer, in his business accounts at FANB. Occasionally, Brinkley would also cash checks written on Dr. Glaz-

er's personal account in order to provide him with cash for his weekly expenses. Brinkley was, therefore, required to go to the bank on almost a daily basis.

In the fall of 1989, Brinkley began embezzling funds from Dr. Glazer by cashing the insurance checks and keeping the money for herself. Typically, Brinkley would accomplish this by simply forging Dr. Glazer's signature as an endorsement on the checks before she approached the teller's window, although sometimes the FANB tellers cashed the checks without any endorsement whatsoever. After cashing an insurance check, Brinkley would then hide her wrongdoing by deleting the corresponding patient data from the office computer. She would also destroy the paper index cards that served as back-up files.

In this manner, Brinkley was able to embezzle in excess of $100,000 over almost a two-year period. Perhaps because of their familiarity with Brinkley, during this period the bank employees never verified the purported endorsements on the checks against Dr. Glazer's signature card; nor did they ever contact his office to inquire about Brinkley's authority to cash the checks. In fact, there is no indication that anyone at the bank ever questioned Brinkley's authority to cash the insurance checks in any way.

In February 1991, Dr. Glazer discovered that some insurance checks were missing and, suspecting someone in his office, hired a detective agency to investigate the matter. The ensuing investigation focussed on Brinkley. After it became clear that a substantial number of these checks were missing, and that Brinkley was the likely culprit, Dr. Glazer and his wife attempted to enlist the aid of FANB in obtaining copies of the checks cashed by Brinkley. The bank, however, refused to provide any assistance. After the Glazers had obtained a statement from Brinkley admitting her involvement, they again asked the bank for help in tracking down the checks. The bank again refused.

Because Brinkley's scheme had left his records in a state of disarray, and because of the bank's refusal to provide assistance, Dr. Glazer was forced to completely reconstruct

his records. That task, which took several months and required Dr. Glazer to hire extra personnel, involved reviewing all medical records of the surgery center where he rendered anesthesia services, sending many letters to insurance companies requesting copies of checks written to him, and comparing all this data to the office computer records. It was, needless to say, a tedious and expensive undertaking.

Dr. Glazer subsequently brought suit against the bank in the Shelby County Chancery Court. In the first claim set forth in the complaint, he alleged that FANB, by paying the checks over the forged endorsements, converted his property in violation of Tenn.Code Ann. § 47–3–419. The complaint also included a claim alleging that FANB breached its duty, as set forth in the depositary agreement, by failing to cooperate in determining the number and amount of checks cashed over the forged endorsements. Dr. Glazer requested consequential damages on this latter claim for the expenses he incurred in reconstructing his records.

At the conclusion of the trial, the chancellor found that although the actions of the bank tellers and manager were "honest" throughout the fraudulent scheme, the bank nevertheless failed to act in a commercially reasonable manner as required by § 47–3–419(3). Therefore, it awarded Dr. Glazer $135,780.35—the face amount of all checks that were introduced into evidence, plus prejudgment interest. The chancellor also awarded $100,073.11 in consequential damages for the amount Dr. Glazer expended on reconstructing his records and on attorney's fees, explaining that: "after plaintiff discovered the scheme to defraud on the part of his employee, defendant bank failed and refused to cooperate in helping determine the various checks that were the subject of the scheme . . ."

FANB appealed from this judgment to the Court of Appeals. That court affirmed the chancellor's ruling on the conversion claim in all respects; it also approved the chancellor's decision to award consequential damages. However, the Court reduced the amount of consequential damages awarded by the chancellor, concluding that attorney's fee component of the award was not proper. We granted FANB's Rule 11, Tenn. R.App. P. application for the limited purpose of addressing to what extent consequential damages are available in a conversion claim under Tenn.Code Ann. § 47–3–419.

### ANALYSIS

■ The UCC statute pertaining to the conversion of instruments, Tenn.Code Ann. § 47–3–419 provides, in pertinent part, as follows:

(1) An instrument is converted when:

. . .

(c) it is paid on a forged endorsement. (2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.

Thus, the statute does not on its face address the issue of whether consequential damages are available in an action for conversion.

FANB argues, however, that such damages may not be awarded except when there is evidence of "bad faith" on the part of the defendant. It cites in support of this argument Tenn.Code Ann. § 47–4–103(5), part of the UCC chapter entitled "bank deposits and collections," which provides that:

The measure of damages for the failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, *and where there is bad faith it includes other damages, if any suffered by the party as a proximate consequence.*

(emphasis added).

FANB then contends that because "good faith" is defined by the UCC as "honesty in fact in the conduct or transaction concerned," Tenn.Code Ann. § 47–1–201(19), bad faith must mean dishonesty—it cites *McConnico v. Third Nat'l Bank,* 499 S.W.2d 874 (Tenn. 1973) in support of this argument. FANB concludes that because the chancellor found that FANB's employees were honest throughout the fraudulent scheme, the bank

did not exhibit the bad faith required to sustain an award of consequential damages.

Dr. Glazer advances two arguments in response to this contention. Initially, he cites a general provision of the UCC, Tenn.Code Ann. § 47–1–106, which provides as follows:

The remedies provided by chapters 1–9 of this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in chapters 1–9 of this title *or by other rule of law.*

(emphasis added).

Dr. Glazer then argues that since § 47–3–106 allows consequential damages if they are sanctioned by "other rule of law," and since the common law of conversion allowed a recovery for all injuries that were sustained as a natural and proximate result of defendant's wrong, *Lance Productions v. Commerce Union Bank,* 764 S.W.2d 207, 213 (Tenn.App. 1988), the award of consequential damages by the courts below was proper.

■ Although this argument was accepted by the Court of Appeals in this case, we must reject it. The argument assumes that any "other rule of law" will serve to sanction an award of consequential damages, no matter if the "other rule" is blatantly inconsistent with provisions of the UCC. This assumption is erroneous, for while the UCC incorporates other rules of law, it does so only to the extent that they are consistent with its statutory provisions. This is illustrated by Tenn. Code Ann. § 47–1–103, which provides as follows:

*Unless displaced by the particular provisions of chapters 1–9 of this title, the principles of law and equity,* including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause *shall supplement its provisions.*

(emphasis added).

Because the common law of conversion regarding consequential damages is directly opposed to § 47–4–103(5)—the UCC statute on the subject—by definition the common law cannot *supplement* the UCC; if we were to apply the common law, it would have to be *substituted* for § 47–4–103(5). Thus, we conclude that § 47–4–103(5) has displaced the common law of conversion with respect to consequential damages, and Dr. Glazer's first argument must fail.

Dr. Glazer alternatively argues that the bank did act in bad faith, despite the chancellor's finding that its employees were honest. He contends that FANB's definition of bad faith is too narrow, and that term should encompass not only instances of outright deception and untruthfulness but also "actions in knowing or reckless disregard of the customer's contractual rights."[1] Because the bank failed to cooperate even after it was apprised of the fraudulent scheme, Dr. Glazer concludes, it acted in bad faith and thus the award was proper.

■ In assessing the merits of this contention, we first note that FANB is correct that 47–1–201(19) does make a party's "good faith" dependent upon its "honesty," and that this Court, in *McConnico, supra,* did equate "bad faith" with "dishonesty." This does not end the inquiry, however, for the word "honesty," which is not defined in the code, is susceptible to more than one definition. For example, *Webster's* defines "honesty" as "freedom from subterfuge or duplicity," a definition that supports the bank's argument. *Webster's Third International Dictionary* 1086 (G.C. Merriam Co.1976). However, *Webster's* also defines the term as "fairness and straightforwardness of conduct," *id.,* which tends to support Dr. Glazer's argument. Moreover, several courts have concluded that the term "bad faith" encompasses a wider range of actions than outright deception or untruthfulness. *Shearson Lehman Bros., Inc. v. Wasatch Bank,* 788 F.Supp.

---

1. Dr. Glazer relies upon *Peregrine Homes v. Jefferson Bank and Trust,* 713 P.2d 1342, 1344 (Colo.App.1985) for this definition.

1184, 1196 (D.Utah 1992); *Kraftsman Container Corp. v. United Counties Trust Co.,* 169 N.J.Super. 488, 404 A.2d 1288, 1293 (1979); *Taylor v. Citizens Bank of Albany,* 290 Ky. 149, 160 S.W.2d 639, 641 (1942). Taking into consideration the various meanings of the word "honesty," and the conclusions of other courts, we accept the definition proffered by Dr. Glazer.

Having accepted that bad faith can be defined as a knowing or reckless disregard of a customer's rights is not, however, determinative of this case. In order for the consequential damages award to be valid, Dr. Glazer must also show that the bank's conduct actually violated his *rights*. In other words, he must show that the bank was under some duty, whether it be based on contract, statute, regulation, or judicial decision, to assist him in investigating the fraudulent scheme.

■ This Dr. Glazer has failed to do. Although he states in the complaint that (1) "in violation of the provisions of the depository agreement between the parties, the bank has failed and refused to comply with this request [to produce copies of all checks cashed at the bank]; and (2) "defendant bank has breached its duty to plaintiff, its customer, by failing to cooperate in determining the number and amount of checks cashed on which there were forged endorsements,"[2] Dr. Glazer points to nothing in the depositary contract to support these statements. Furthermore, he cites no statute, regulation, or judicial decision charging the bank with any such duty; and our research has failed to reveal any such law.[3] This is not surprising, for under Tennessee law the relationship of FANB and Dr. Glazer was simply that of debtor/creditor; therefore, the bank had no fiduciary duty to him. *Macon County Livestock Market v. Kentucky State Bank,* 724 S.W.2d 343, 350 n. 9 (Tenn.App.1986); *Dick-*

son v. Simpson, 172 Tenn. 680, 687–88, 113 S.W.2d 1190, 1192–93 (1938).

■ Because Dr. Glazer has not proved that the bank's refusal to cooperate in the investigation violated any contractual or other legal right of his, the bank cannot be held to have acted in bad faith. Because the UCC requires a finding of bad faith before consequential damages may be awarded, the judgment of the Court of Appeals and the trial court is reversed to the extent that it allowed such damages.

BIRCH, C.J., and ANDERSON, REID and WHITE, JJ., concur.

---

**2.** These statements were denied by the bank in its answer.

**3.** The fact that the trial court ordered FANB to produce copies of all canceled checks payable to Dr. Glazer does not mean that the bank was under a legal duty to produce the checks before the order was handed down. Under Rule 26.02

Tenn. R. Civ. P., a party may obtain discovery of any material that is not privileged and is relevant to the subject matter of the pending action. That a document is discoverable under Rule 26.02 obviously does not mean that the opposing party has a separate and independent legal duty to make the document available.