IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JANUARY 22, 2004 Session

## JUDITH MAE HARBER As Trustee of Trust B for the Estate of Edwin Erwin v. LEADER FEDERAL BANK FOR SAVINGS

**Direct Appeal from the Circuit Court for Shelby County**
**No. 70109 T.D.     Robert A. Lanier, Judge**

---

**No. W2003-01523-COA-R3-CV - Filed June 16, 2004**

---

This case involves the wrongful payment of funds by Defendant over Plaintiff's forged signature. The lower court found that the majority of Plaintiff's claims are barred by former Tenn. Code Ann. § 47-4-406, which places a one-year limit on certain claims by bank customers seeking to recover losses occasioned by unauthorized signatures. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Everett B. Gibson, Lawrence Harris, Memphis, TN, for Appellant

Robert E. Craddock, Jr., John S. Wilson, III, Jeffrey Fleishmann, Memphis, TN, for Appellee

**OPINION**

**Facts and Procedural History**

Edwin Erwin ("Mr. Erwin") died on February 29, 1988, leaving a will that provided for the creation of two testamentary trusts, Trust A and Trust B, to be used for the benefit of his wife, Alma Erwin ("Ms. Erwin"), for the remainder of her life. Upon Ms. Erwin's death, the remaining assets of the two trusts were to be disbursed to the Erwins' four children. Under the will, the Erwins' daughter, Judith Harber ("Plaintiff"), acted as the trustee for both trusts. On July 12, 1988, acting in her capacity as trustee, Plaintiff used $100,000 from the Trust B account to purchase a Large Denomination Certificate ("LDC") from Leader Federal Bank for Savings ("Defendant"). Plaintiff provided Defendant with a copy of the will at this time. Defendant, in turn, issued Plaintiff a

passbook and assigned account number 946583-2 to the LDC. The LDC, characterized by Defendant as a time deposit, was to earn interest for six months, at which time it would reach maturity. Upon reaching maturity, the LDC would not automatically renew or convert into an interest-bearing account. Instead, it would simply remain inert, earning no interest, until Plaintiff closed the account or otherwise provided for its disposition.

On January 9, 1989, the date of maturity, Plaintiff's husband ("Husband"), whom she has since divorced, gave Defendant unauthorized instructions to convert the LDC into an Instant Access account. The redesignation of the account was noted in Plaintiff's passbook, which Husband had in his possession at the time. The Instant Access account retained the same account number and was still held in Plaintiff's name. It had several different characteristics, however, than the LDC: monthly account statements sent to the account holder; no time limit on accrual of interest; no minimum balance of $100,000; instant accessibility of funds by check or withdrawal; and the ability to withdraw only a portion of the account's funds without incurring a penalty. After Husband converted the LDC to the Instant Access account, Plaintiff began to receive monthly account statements at her home, as well as monthly interest checks. Plaintiff admits that she did not read any of the account statements sent to her during this period, nor did she take note of the fact that she had not received account statements under the terms of the LDC. She also admits that she indorsed at least six interest checks from April to December of 1989 sent under the terms of the Instant Access account.

Approximately four years after he effected the conversion of the LDC to the Instant Access account, Husband made a total of eight unauthorized withdrawals from the Instant Access account that depleted the entire balance of the account.[1] He completed the withdrawals by forging Plaintiff's name on withdrawal orders. Pursuant to the terms of the Instant Access account, Defendant attached the paid withdrawal orders to the monthly account statements sent to Plaintiff, who failed to inspect the statements. Plaintiff did not discover the unauthorized conversion and withdrawals until April 1995, when she sought to settle Ms. Erwin's estate and distribute the residue of Trust A and Trust B. By this time, Husband had already fled the jurisdiction.

On May 25, 1995, Plaintiff filed suit against Defendant for breach of contract for allowing Husband to convert the LDC to the Instant Access account and subsequently withdraw the funds. She also sought to recover from Defendant certain interest checks issued under the Instant Access account that were paid to Husband over Plaintiff's forged signature. Defendant countered by arguing that Plaintiff's claim is barred by Tenn. Code Ann. § 47-4-406, which places a one year limit on claims against banks arising from unauthorized signatures. Defendant further argued that Plaintiff had ratified the conversion of her LDC to an Instant Access account by indorsing interest checks, thereby accepting the benefit of the conversion. Plaintiff and Defendant each moved for summary judgment, and, following a hearing on April 20, 2001, the trial court issued its order. In the May 20 order, the trial court granted Defendant partial summary judgment, ruling that the one-year limit set

---

[1] The unauthorized withdrawals occurred on January 25, 1993, March 25, 1993, November 9, 1993, January 27, 1994, March 2, 1994, April 8, 1994, May 27, 1994, and November 16, 1994.

forth in Tenn. Code Ann. § 47-4-406 precludes Plaintiff from challenging the conversion of the LDC and the first six withdrawal orders forged by Husband. The trial court then granted Plaintiff partial summary judgment as to the final two withdrawals, based on its determination that Defendant had paid the withdrawals in bad faith. The lower court also found that certain interest checks from the Instant Access account were recoverable by Plaintiff. In total, Plaintiff was awarded $9,884.64 for the unauthorized withdrawals and $46.01 in interest check amounts, plus prejudgment interest on both amounts. Plaintiff then timely filed this appeal, raising the following issues, as we perceive them, for our consideration:

I.      Whether the trial court erred in finding that Tenn. Code Ann. § 47-4-406 bars Plaintiff's claim regarding the conversion transaction;

II.     Whether the trial court erred in finding that Tenn. Code Ann. § 47-4-406 bars, in part, Plaintiff's claim regarding the unauthorized withdrawals from the Instant Access account; and

III.    Whether the trial court erred in finding that Tenn. Code Ann. § 47-4-406 bars, in part, Plaintiff's claim regarding interest checks from the Instant Access account.

Defendant raises two additional issues:

IV.     Whether the trial court erred in finding that Defendant lacked good faith in paying the forged withdrawal orders presented by Husband; and

V.      Whether the trial court erred in awarding prejudgment interest.

**Standard of Review**

In *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83 (Tenn. 2000), the Tennessee Supreme Court set forth the standards governing appellate review of a trial court's grant of summary judgment:

> Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Cent. S.*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion; *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).

*Staples*, 15 S.W.3d at 88.

**Applicable Law**

As an initial matter, we must identify the version of Tenn. Code Ann. § 47-4-406 that applies to the present dispute. *See Kuykendall v. Wheeler*, 890 S.W.2d 785, 787 (Tenn. 1994); *Ingram v. Earthman*, 993 S.W.2d 611, 623 (Tenn. Ct. App. 1998). The conversion of the LDC to an Instant Access account occurred on January 9, 1989, and the unauthorized withdrawals took place between January of 1993 and November of 1994. In 1995, the General Assembly adopted a revised version of the Uniform Commercial Code that changed, among other things, the language of Tenn. Code Ann. § 47-4-406. *See Ingram*, 993 S.W.2d at 623. The relevant portion of the pre-1995 statute, found at Tenn. Code Ann. § 47-4-406(3) (1994), states:

> A customer who does not within one (1) year from the time the statement *and* items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three (3) years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

Tenn. Code Ann. § 47-4-406 (1994) (emphasis added). The analogous provision of the current statute, initially enacted in 1995, is contained in Tenn. Code Ann. § 47-4-406(f) (2001), which states:

> A customer who does not within one (1) year after the statement *or* items are made available to the customer (subsection (a)) discover and report an occurrence referred in subsection (c) is precluded from asserting against the bank any claim with respect thereto. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under § 47-4-208 with respect to the unauthorized signature or alteration to which the preclusion applies.

Tenn. Code Ann. § 47-4-406 (2001) (emphasis added).

In determining whether to apply the current version of the statute, or the pre-1995 version in effect during the events at issue, we bear in mind the holding of the Tennessee Supreme Court in *Kuykendall*:

> Whether a statute applies retroactively depends on whether its character is "substantive" or "procedural." If "substantive," it is not applied retroactively because to do so would "disturb a vested right or contractual obligation." *Saylors v. Riggsbee*, 544 S.W.2d 609, 610 (Tenn. 1976). On the other hand, "[r]emedial or procedural statutes apply retrospectively not only to causes of action arising before such acts become law, but also to all suits pending when the legislation takes effect, unless the legislature indicates that a contrary intention or immediate application would produce an unjust result." *Id.* (citations omitted). A statute is procedural if

-4-

it defines "[t]he mode or proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right . . . ." *Id.*

*Kuykendall*, 890 S.W.2d at 787. On its face, the time restriction set forth in Tenn. Code Ann. § 47-4-406 would seem to be a statute of limitations that is, arguably, procedural in nature. However, the majority of jurisdictions that have considered this provision of the Uniform Commercial Code have held that it is, in fact, a substantive rule of law. *See Euro Motors, Inc. v. Southwest Fin. Bank and Trust Co.*, 696 N.E.2d 711, 714 (Ill. App. Ct. 1998); *Jensen v. Essexbank*, 483 N.E.2d 821, 822 (Mass. 1985); *Space Distrib., Inc. v. Flagship Bank of Melbourne*, 402 So. 2d 586, 589 (Fla. Dist. Ct. App. 1981); *Ind. Nat'l Corp. v. Faco, Inc.*, 400 N.E.2d 202, 205 (Ind. Ct. App. 1980). The one-year period of limitation acts as a "statutory prerequisite of notice, not as a statute of limitations within which a suit must be filed." *Euro Motors, Inc.*, 696 N.E.2d at 714. Accordingly, we will not apply the current version of Tenn. Code Ann. § 47-4-406 (2001) retroactively, but will instead use the pre-1995 version in effect during the events at issue.

### The Conversion Transaction

On January 9, 1989, the date that Plaintiff's LDC matured, Defendant converted the LDC into an Instant Access account based on Husband's unauthorized instructions. In its order granting Defendant partial summary judgment, the trial court held that Plaintiff's claim on this wrongful transaction is barred by the one-year limitation set forth in Tenn. Code Ann. § 47-4-406(3) (1994). This ruling was premised on the lower court's finding that the LDC constituted an "account," as defined in Tenn. Code Ann. § 47-4-104(1) (1994). The trial court apparently reasoned that Tenn. Code Ann. § 47-4-406 applies to any transaction involving an "account."[2] This broad approach ignores critical limiting language contained in the statute.

The pre-1995 version of Tenn. Code Ann. § 47-4-406(3) places a one-year limitation on claims by customers who receive an account statement and item[3] that reveal an unauthorized signature or alteration on the item. After reviewing the record, we find that the conversion transaction does not satisfy the elements necessary to trigger the one-year limitation contained in the statute. The conversion transaction occurred when Husband provided oral instructions, in person, for the conversion of the LDC to the Instant Access account. The conversion itself was a "record change" that was effected by "three or four key strokes on the terminal" according to a former bank manager for Defendant. The only written record of the transaction was a notation, with no signature, entered in the Plaintiff's passbook, which was in Husband's possession at the time. Otherwise, the entire transaction was completed electronically, with no paper trail.

---

[2] The trial court ruled, in relevant part, as follows: "[B]ased on the terms of the LDC and the definition of 'account' presented in § 47-4-104(1), the LDC at Leader bank and the transactions therefrom qualify as 'accounts.'" The lower court then reasoned that "[b]ecause Article 4 applies, former § 47-4-406(3) requires the conversion . . . to be excluded because [it] occurred beyond the one year period."

[3] The pre-1995 version of Tenn. Code Ann. § 47-4-104(g) defines an item as "any instrument for the payment of money even though it is not negotiable but does not include money."

The conversion transaction, as described, fails to meet two of the criteria necessary to trigger the one-year limit set forth in former Tenn. Code Ann. § 47-4-406(3). First, the electronic conversion of the LDC is not an "item" within the meaning of Article 4. Although Tennessee courts have not specifically addressed this issue, other jurisdictions dealing with this question have found that "item" does not include transactions effected entirely by electronic means. *See Sinclair Oil Corp. v. Sylvan State Bank*, 869 P.2d 675, 680 (Kan. 1994) (citing *Bradford Trust Co. v. Tex.-Am. Bank Houston*, 790 F.2d 407, 409 (5th Cir. 1986); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982); *Delbrueck & Co. v. Mfrs. Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir. 1979); *Walker v. Tex. Commerce Bank, N.A.*, 635 F. Supp. 678, 681 (S.D. Tex. 1986); *Weeks Office Prods., Inc. v. Chem. Bank*, 180 A.D.2d 419, 579 N.Y.S.2d 86 (1992)). Although *Sinclair Oil Corp.* dealt with an electronic transfer of funds between accounts with different owners, unlike the present case, the basis for the holding is still persuasive. In that case, the Kansas Supreme Court stated, in relevant part:

> The substantive rationales that courts have expressed for excluding [electronic fund transfers] from UCC coverage include: (1) electronic debits are not "items" within the meaning of Article 4, *Gatoil, Inc. v. Forest Hill State Bank*, 1986 WL 213428, 1 UCC Rep. Serv.2d 171, 182 (D.Md. 1986); (2) the UCC "does not specifically address the problems of electronic fund transfers," *Delbrueck & Co.*, 609 F.2d at 1051; and (3) the UCC drafters never contemplated electronic transactions when developing the Code, *Evra Corp.*, 673 F.2d 951, 955 . . . The ideas in Articles 3 and 4 of the UCC, as pointed out by White and Summers, depend upon bankers looking at particular words and numerals on the face of a particular instrument. In the case of [electronic fund transfers], the medium of communication is the computer and the computer message. 1 White & Summers, Uniform Commercial Code, p.811.

*Sinclair Oil Corp.*, 869 P.2d at 680-81. As this language demonstrates, Article 4 and, by extension, former Tenn. Code Ann. § 47-4-406(3), were simply not created to govern transactions that are wholly electronic, as opposed to more traditional transactions effected by written instruments. This is one reason that the conversion transaction in the instant case does not fall within the purview of former Tenn. Code Ann. § 47-4-406(3). In addition to the absence of an "item" in the transaction, the conversion also lacks any "unauthorized signature." The record clearly demonstrates that no signature whatsoever was used to effectuate the conversion of the LDC to the Instant Access account. Courts that have considered this issue have held that the lack of an unauthorized signature prevents a transaction from triggering the one-year limit in § 4-406(3). *See, e.g.*, *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 564 (Tex. 1984). Based on both of the foregoing reasons, we reverse the ruling of the trial court and hold that Plaintiff's claim on the conversion transaction is not barred by the one-year limitation enumerated in former Tenn. Code Ann. § 47-4-406(3).

Defendant raises an alternative argument, originally made at the trial level, that Plaintiff is still barred from challenging the conversion based on either estoppel or ratification. It is a well accepted principle that a deposit creates a contractual relationship between depositor and bank. *Hamilton Nat. Bank of Chattanooga v. Swafford*, 376 S.W.2d 470, 477 (Tenn. 1964); *Foutch v.*

*Alexandria Bank & Trust Co.*, 149 S.W.2d 76, 80 (Tenn. 1941). It is, likewise, elemental that modification of an existing contract cannot be accomplished by the unilateral action of one party. *Galbreath v. Harris*, 811 S.W.2d 88, 92 (Tenn. Ct. App. 1990); *Batson v. Pleasant View Util. Dist.*, 592 S.W.2d 578, 582 (Tenn. Ct. App. 1979); *Balderacchi v. Ruth*, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952). Instead, there must be "the same mutuality of assent and meeting of the minds as required to make a contract." *Balderacchi*, 256 S.W.2d at 391. It is undisputed in the present case that there was no mutuality of assent between Plaintiff and Defendant at the time the LDC was converted to the Instant Access account. The record also reveals that the terms of the LDC were such that it was not to be automatically renewed or converted upon maturity. Instead, it was to remain static, without earning interest, until Plaintiff provided for its disposition. In light of these terms, it is clear that, in the absence of estoppel or ratification, the conversion of the LDC constituted a breach of contract by Defendant rather than an effective modification of the previous deposit contract.

It is fundamental that a principal who ratifies an unauthorized contract is bound by its terms as if he or she had executed it originally. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001) (citing 12 *Williston on Contracts* § 35.22 (4th ed. 1999)). Ratification of an unauthorized transaction occurs when "one approves, adopts, or confirms a contract previously executed 'by another[,] in his stead and for his benefit, but without his authority.'" *Id*. at 270 (citation omitted). It is usually a question of the principal's intent, an issue that is generally regarded as a question of fact to be determined from the surrounding circumstances. *Id*. Ratification may, however, be implied from silence or from conduct justifiable only if there is a ratification. *Id*.; *Valley Fid. Bank and Trust Co. v. Cain P'ship, Ltd.*, 738 S.W.2d 638, 640 (Tenn. Ct. App. 1987). In fact, as the Tennessee Supreme Court noted in *Webber*, "some actions so clearly evidence a principal's intent to ratify the transaction that ratification may be said to happen as a matter of law." *Webber*, 49 S.W.3d at 270. The Court then addressed a particular course of action that often gives rise to a finding of ratification:

> One action that clearly evidences a principal's intention to ratify an otherwise unauthorized contract is the bringing of a lawsuit to enforce the terms of that contract. The law has long been settled that "[b]y bringing an action on the contract, a principal will be held to have ratified it, whether the action be against the third person, or against the agent, for the proceeds of the contract." *Memphis St. Ry. Co.*, 118 Tenn. at 621, 102 S.W. at 348. In fact, one court has characterized the bringing of a suit based upon the actions of another as "one of the most unequivocal methods of showing a ratification of an agent's authority . . . ." *Mattila v. Olsvick*, 228 Or. 606, 365 P.2d 1072, 1074 (1961) . . . . Importantly, though, once a principal commences an action on a contract, he or she may not ratify only the beneficial parts of the contract and disclaim the remainder of the obligations as unauthorized. *James Cable Partners, L.P. v. City of Jamestown*, 818 S.W.2d 338, 344 (Tenn. Ct. App. 1991).

*Webber*, 49 S.W.3d at 270-71.

In this case, Plaintiff seeks damages primarily arising from the loss of her $100,000 deposit. This portion of her suit certainly does not support a finding of ratification, as she can demand these funds under the terms of the original LDC contract, while still contesting the validity of the conversion transaction. More problematic, however, is Plaintiff's attempt to recover the amount of certain interest checks that were paid to Husband over Plaintiff's forged signature. The interest checks in question were issued under the terms of the Instant Access account, which would bear interest indefinitely. The LDC, by contrast, had matured as of January 9, 1989, the date of the unauthorized conversion, and Plaintiff would not have received any interest checks after this date but for the conversion. Consequently, Plaintiff seeks to enforce a provision of the Instant Access account, while also denying that she agreed to its terms. In light of the holding in *Webber*, we must conclude that, in seeking to enforce a provision of the Instant Access account, Plaintiff has ratified the conversion of her LDC to an Instant Access account. Accordingly, she is bound by the terms of the Instant Access account and cannot now disclaim those provisions that are not beneficial. *Webber*, 49 S.W.3d at 270-71.[4] We, therefore, affirm the trial court's grant of summary judgment to Defendant on this issue. We must now determine whether the trial court properly dismissed Plaintiff's claim as to six of Husband's eight unauthorized withdrawals from the Instant Access account.

**The Unauthorized Withdrawals**

Husband effected eight separate withdrawals from the Instant Access account by forging Plaintiff's signature on withdrawal orders. These transactions took place over a period of nearly two years, from January of 1993 to November of 1994. In its order, the trial court granted Defendant summary judgment as to the first six withdrawals, because they occurred more than a year before Plaintiff reported the transactions to Defendant on April 26, 1995.[5] The lower court found that the one-year limitation in former Tenn. Code Ann. § 47-4-406(3) precluded Plaintiff from asserting a

---

[4]      Much like the Court in *Webber*, we do not find that our holding in *Absar v. Jones*, 833 S.W.2d 86 (Tenn. Ct. App. 1992) demonstrates that a genuine issue of material fact exists in this case. In *Absar*, the plaintiffs filed a personal injury lawsuit in which their attorney settled the matter without the knowledge or permission of the plaintiffs and then absconded with the settlement proceeds. *Id*. at 87-88. Once they discovered the fraud, the plaintiffs filed suit against their attorney to recover the proceeds. *Id*. Thereafter, the plaintiffs filed another suit, in which they sought to set aside the court approval of the unauthorized settlement. *Id*. The defendant in the original action then argued that the plaintiffs had ratified the settlement agreement by filing suit to recover the settlement proceeds from their attorney. *Id*. We found that the plaintiffs had not ratified the settlement because the suit against their former attorney could be explained without involving any intention to secure benefits from the unauthorized settlement. *Id*. at 90. Instead, the plaintiffs were only trying to minimize the damages suffered by them as a result of the unauthorized act. *Id*. Here, Plaintiff's claim to recover on the interest checks cannot be said to constitute an attempt to minimize her damages. Plaintiff would not have received any of the interest checks in question had the LDC not been converted, and, therefore, she suffered no damages under the terms of the LDC when those checks were paid to Husband. Her claim must be viewed, then, as an attempt to secure a benefit from the unauthorized conversion, and, as such, it falls within the analysis in *Webber*.

[5]      The first six withdrawals took place on the following dates: January 26, 1993; March 25, 1993; November 9, 1993; January 27, 1994; March 2, 1994; and April 8, 1994.

claim as to these transactions. Having reviewed the relevant authority in light of the facts of this case, we agree with the ruling of the trial court.

As discussed above, Plaintiff ratified the conversion of the LDC to the Instant Access account. Under the terms of the Instant Access account, account statements were made available to Plaintiff. These statements disclosed activity on the account, including Husband's unauthorized withdrawals. Unlike the conversion transaction, these withdrawals do involve both unauthorized signatures, which Husband forged on the withdrawal orders, and "items," in the form of the written withdrawal orders themselves. Defendant sent Plaintiff monthly account statements, accompanied by copies of the fraudulent withdrawal orders, that revealed the unauthorized activity on the Instant Access account. For six of the withdrawals, Plaintiff then failed to discover and report their unauthorized nature within a one-year period. As such, former Tenn. Code Ann. § 47-4-406(3) precludes Plaintiff from asserting a claim against Defendant on these withdrawals. We, therefore, affirm the trial court's grant of summary judgment on this issue.

### The Interest Checks

In her final issue on appeal, Plaintiff challenges the lower court's finding that former Tenn. Code Ann. § 47-4-406(3) bars her claim for those interest checks, issued under the terms of the Instant Access account, that were wrongfully paid to Husband prior to April 26, 1994. She argues that the one-year limit does not apply because the interest checks do not constitute "items paid in support of debit entries" as required by former Tenn. Code Ann. § 47-4-406(1). We agree.

As we discussed earlier, subsection (3) of former Tenn. Code Ann. § 47-4-406 applies when an account statement and an item are made available to a customer, who then fails to report within one year unauthorized activity revealed by the statement and item. In setting forth the "statement" and "item" requirement, subsection (3) specifically references subsection (1), which provides a more thorough explanation of the terms. Subsection (1) provides, in relevant part, that a customer's duty to discover and report an unauthorized signature is triggered when a bank sends the customer a statement of account accompanied by items "paid . . . in support of the debit entries." According to the plain language of the statute, then, the item at issue must have been paid in support of a debit entry on the customer's account before any statutory duty will arise. Here, the interest checks were not paid in support of debit entries. Instead, it is undisputed that Defendant paid any interest due Plaintiff by means of cashier's check. In *Stringfellow v. First Am. Nat'l Bank*, 878 S.W.2d 940 (Tenn. 1994), the Tennessee Supreme Court noted:

> In Tennessee, as elsewhere, there are essentially two types of checks in general use: ordinary checks, which are drawn upon a bank by someone other than the bank; and bank checks, which is a general term that is used to refer to a variety of instruments, including cashier's checks. A cashier's check is a check drawn by a bank upon itself.

*Id*. at 942-43. It is clear, then, that Defendant issued interest checks by drawing upon its own funds rather than by debiting Plaintiff's account. As such, the lower court erred in finding that interest

checks wrongfully paid to Husband are barred by former Tenn. Code Ann. § 47-4-406. We, therefore, reverse the trial court's ruling on this issue and remand for a determination of Plaintiff's damages.

## Bad Faith Payment of Withdrawal Orders

In its first issue on appeal, Defendant argues that the trial court erred in finding that Defendant failed to act in good faith when paying the withdrawal orders of May 27, 1994 and November 16, 1994, the only two withdrawals not barred by the one-year limit in former Tenn. Code Ann. § 47-4-406(3). We note, as an initial matter, that a grant of summary judgment on the issue of bad faith is proper only if reasonable minds could not differ. *S. Fire & Cas. Co. v. Norris*, 250 S.W.2d 785, 791 (Tenn. Ct. App. 1952). Here, the lower court based its ruling on the analysis of "good faith" provided in *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546 (Tenn. 1996). In that case, the Tennessee Supreme Court held that "bad faith" on the part of a bank may include a "knowing or reckless disregard of the customer's rights." *Id*. at 550. Based on this definition, the lower court found that reasonable minds could not disagree that Defendant had acted in bad faith in paying the two withdrawal orders at issue:

> It is stipulated among the parties that the authority of Plaintiff, trustee, was created in the will of Edwin Erwin. It is also stipulated that a copy of the will was filed with [Defendant] at the creation of the various trust accounts therefrom. In addition, based on the account and the terms thereof, [Defendant] had knowledge that the Plaintiff was the account holder and therefore the only person authorized to conduct transactions on behalf of the beneficiaries of the trust . . . [this constitutes] a showing that the bank failed to act in good faith when paying the items . . . .

We agree. Here, Defendant had several forms of notice that Plaintiff was the only person authorized to conduct transactions on the account, yet consistently allowed a third party to make unauthorized transactions over a period of years. This constitutes the type of reckless disregard of Plaintiff's rights as a customer that warrants a finding of "bad faith" at the summary judgment level. Accordingly, we affirm the ruling of the trial court on this issue.

## Prejudgment Interest

Finally, Defendant challenges the lower court's award of prejudgment interest running from the date Plaintiff made her demand on Defendant in April of 1995. The Tennessee Supreme Court stated in *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998):

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion . . . Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must

decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Otis*, 850 S.W.2d at 446. In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. *Mitchell*, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. *Id*. (citing *Textile Workers Union v. Brookside Mills, Inc.*, 205 Tenn. 394, 326 S.W.2d 671, 675 (1959)). We note that these criteria, if strictly construed, could prohibit the recovery of prejudgment interest in the vast majority of cases . . . Not surprisingly, an analysis of relevant case law reveals that these criteria have not been used to deny prejudgment interest in every case where the defendant reasonably disputed the existence or amount of an obligation. More typically, courts either use the certainty of a claim as support for an award of prejudgment interest, or they do not discuss the certainty of the claim at all . . . [Thus] [t]he uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

*Id*. at 927-28. Here, Plaintiff's right of recovery may have been a subject of dispute, but the actual amounts represented by each withdrawal were not. Each withdrawal was documented precisely, so the amount of damages to be awarded can be easily ascertained. Further, the record indicates that Plaintiff was without the use of these proceeds, which would have been earning interest had they not been wrongfully disbursed, from the date of the loss. Thus, Plaintiff cannot be fully compensated without an award of interest. As such, we find that there is evidence to support the trial court's award of prejudgment interest. Consequently, we affirm the lower court's decision, which was not an abuse of discretion.

## Conclusion

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the Appellant, Judith Mae Harber and her surety, and the Appellee, Leader Federal Bank for Savings, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE